MID-PACIFIC DRESS MANUFACTURING COMPANY, LIMITED, THEO. H. DAVIES & COMPANY, LIMITED, AND V. D. DOTY *v.* L. V. CADINHA, AS ASSIGNEE FOR THE BENEFIT OF THE CREDITORS OF NEW YORK DRESS COMPANY, LIMITED, L. V. CADINHA, INDIVIDUALLY, C. T. DAVENPORT, AND C & D DRESS COMPANY, LIMITED.

No. 2464.

ARGUED FEBRUARY 21, 22, 1944.          DECIDED JULY 5, 1944.

PETERS AND LE BARON, JJ., AND CIRCUIT JUDGE O'BRIEN IN PLACE OF KEMP, C. J., DISQUALIFIED.

This is a suit in equity for an accounting and the setting aside of two consecutive conveyances of property which, it is alleged, were made by the respondents when the property was under assignment for benefit of creditors. It is brought by the petitioners as objecting creditors in repudiation of these conveyances against respondent Cadinha as assignee for benefit of creditors, respondent Davenport as intermediate transferee, and respondent C & D Dress Company, Limited, as ultimate transferee, the petitioners claiming that the transfers constituted a misappropriation of trust property by the respondents in perpetration of a conspiracy to acquire it fraudulently. Although the suit is instituted by the petitioners for the satisfaction of their claims against the trust estate created by the assignment, it is essentially one by interested parties for compensation to the estate itself in the amount of the value of and the profit accruing to the property allegedly misappropriated and mingled with that of the respondents.

The issues (for particulars see *Dress Mfg. Co.* v. *Cadinha*, 33 Haw. 456) may be segregated into three main groups. The first concerns the voidance of the conveyances as the basis of recovery. It deals with the repudiation and the wrongful nature of the alienation. The second affects the amount of recovery. It is contingent upon the first and deals with the accounting and the ascertainment of the amount recoverable. The third relates to the distribution of that which might be recovered. The gist of the action, however, is whether the respondents misappropriated trust property, or specifically whether the transfers were in reality a purchase by the assignee or made by the respondents in his interest without the consent of the creditors or approval of a court of competent jurisdiction.

The evidence in respect thereto is in conflict. To bring

it into bolder relief, the factual background of the case's salient and undisputed evidence stated briefly is:

On December 14, 1929, the New York Dress Company, Limited, assigned its assets and business to Cadinha for benefit of its creditors. Cadinha immediately took possession and under the terms and conditions of the assignment with the approval of the executive committee of creditors and without objection from creditors not represented by the committee conducted the business until February 17, 1932, when he sold the assigned property to Davenport for $2,254.84. From this amount Cadinha distributed $1,754.75 to the creditors as a final dividend, which was approximately 5% of their claims, he having distributed to them a 10% dividend on December 28, 1931. Davenport had been employed as manager of the assigned business on April 1, 1930, and continued as such until his purchase on February 17, 1932. On February 20, 1932, Cadinha petitioned the treasurer of the Territory of Hawaii for the dissolution of the New York Dress Company, Limited, which was granted on July 19, 1932. On March 5, 1932, through the efforts of Cadinha and Davenport, the C & D Dress Company, Limited, was incorporated. On March 18, 1932, Davenport, without taking any profits from the business, transferred the assigned property to the respondent corporation. Cadinha in the meantime continued his association with the business. At the time of transfer he was the president and owned 49.9% of the new corporation's stock, while Davenport was vice-president and treasurer and owned 49.8% of the stock, others who were on the board of directors with them owning 00.3%. The petitioners protested, and on June 18, 1932, as objecting creditors, instituted the instant action to avoid the sale and transfer.

A hearing and rehearing of the case have been held before the circuit court, a supreme court review (*Dress*

*Mfg. Co.* v. *Cadinha, supra*) intervening. Thus it is for the second time before this court.

Upon the hearing, the trial judge found that Cadinha, while assignee, entered into a secret agreement with Davenport to acquire jointly the assigned property, which agreement they carried into effect by the sale to Davenport, the incorporation of the respondent corporation, the transfer to it and the issuance of its shares of stock. The trial judge characterized such a transaction as "either actually or constructively fraudulent or both." He entered a decree accordingly, which awarded the petitioners compensation. Upon respondents' writ of error therefrom, this court reversed the decree and remanded the case to the trial judge "with instructions to grant a new trial" (see *Dress Mfg. Co.* v. *Cadinha, supra*), in respect to which instructions it should be noted that the term "new trial" is deemed to mean a rehearing, this being a suit in equity where there can be no new trial. (See *Supervisors* v. *Kennicott*, 94 U. S. 498, 24 L. ed. 260.)

At the rehearing a different trial judge presided who reopened the issue of fraud, finding that Cadinha acted in good faith and therefore was entitled to be paid for his services as assignee. He further found that the sale to Davenport was valid and for a "more than adequate" purchase price. His decree approved commissions taken by Cadinha in the amount of $8,836.27, awarded the master a fee of $3,000 and dismissed the petitioners' amended bill with costs. From this decree, the petitioners bring the instant appeal.

The petitioners' first specification presents the question whether the trial judge violated the rule of the case in reopening the issue of fraud. Before stating the import at law of such a doctrine, it is well to look at the opinion of this court in *Dress Mfg. Co.* v. *Cadinha, supra.* When the issue of fraud was before it on writ of error, the

respondents' assignments of error thereon were overruled, with the express finding that there was "no reason for disturbing the circuit judge's findings and conclusions" as to "proof of actual and constructive fraud and of conspiracy on the part of the respondents in making the transfers." The legal effect thereof is that this court not only found on review no error of law in the finding that the alienation constituted both constructive and actual fraud but also found that such was justified by the evidence. (See *Land Title, Waimalu*, 33 Haw. 832.) This is equivalent to a determination of a wrongful appropriation and *a fortiori* to a judgment of affirmance of the fact of fraud therein in addition to a decision of adoption of the law pronounced by the trial judge, fraud being a mixed question of law and fact. Having thus settled the basis of recovery, it then became necessary to determine what, if any, the recoverable amount should be. However, this court further found that there was not sufficient evidence before it upon which to fix the amount of liability and for that reason left "the proper rate of any hypothetical recovery or distribution" to the trial judge to ascertain from additional evidence to be adduced. It logically follows therefrom that this court intended that the rehearing be limited thereto in contradistinction to the determined issues of misappropriation. Such an intention may be gleaned from the language and context of the opinion, which largely devoted itself to a critique of the process by which the trial judge at the hearing arrived at the amount of his award, finding that his "money decree * * * did not purport to be based upon evidence introduced either in court or before the master." The opinion's concluding paragraph indicates the remand's limited purpose as follows: "In the instant case, as hereinabove set forth, faulty methods of determining value and profit were employed. The evidence was wholly insufficient to support

the finding of the trial judge in those two regards. The record, however, does not indicate that proper evidence in this respect cannot be supplied; and the law and the facts, therefore, in our opinion warrant the granting of a new trial."

"The rule of the case," more fully termed "the rule of the law of the case," is the *modus operandi* of the law in a cause once it has been established by appellate decision. The precept connotes a judicial formula of expediency to avoid litigation over propositions of law and merits of a case after they have been appellately determined in an action. The doctrine is normally a salutary one in the interest of economy of effort and of narrowing down the issues in successive stages of litigation. (See *White* v. *Higgins*, 116 F. [2d] 312.) Similar to its kindred doctrine of *stare decisis*, it is not, however, an exorable command to the appellate court, and must not be utilized to accomplish an obvious injustice. (See *Cochran* v. *M & M Transp. Co.*, 110 F. [2d] 519; *White* v. *Higgins, supra.*) The doctrine, when applicable to such a court, does not carry the same consequence as that of *res adjudicata.* One directs discretion and pertains to the question of power, the other supersedes discretion, compelling judgment, and pertains to the question of submission. (See *Connett* v. *City of Jerseyville*, 110 F. [2d] 1015; *Southern Railway Co.* v. *Clift*, 260 U. S. 316, 67 L. ed. 283.) The phrase "the rule of the case" in the absence of statute, as it is in this jurisdiction, is merely expressive of the practice of appellate courts generally to refuse to reopen that which they have decided in the same case, not, however, in limitation of their power to do so, they being jealous of the power to do justice according to law and ready to rectify their own error whenever such error is clearly patent. (See *Messenger* v. *Anderson*, 225 U. S. 436, 56 L. ed. 1152; *Cochran* v. *M & M Transp. Co.*, *White* v. *Higgins*,

both *supra*; *Atchison T. & S. F. Ry. Co. v. Ballard*, 108 F. [2d] 768; *Seagraves* v. *Wallace*, 69 F. [2d] 163.) However, the efficacy of the rule prevents litigants on appeal from speculating on any changes in the membership of the appellate court, it not being bound to revise its previous holding at the will of the litigants where the evidence remains substantially the same. (See *Wong Wong* v. *Skating Rink*, 25 Haw. 347; *Roberts* v. *Cooper*, 61 U. S. 467.)

As a corollary to such a doctrine, the rule is binding upon lower courts where it operates initially on remand to limit the scope of a retrial or rehearing within the trial judge's duty as a matter of law to construe the mandate of an appellate court in conjunction with its opinion so as to effectuate what the opinion authoritatively determined as well as the intention expressed therein. (*First Nat. Bank of El Paso, Tex.* v. *Cavin, et al.*, 28 N. M. 468, 214 Pac. 325; *Gaines* v. *Rugg*, 148 U. S. 228, 37 L. ed. 432; *Lewis* v. *Barnes*, 220 S. W. 487 [Mo. Sup.].) It follows therefrom on principle that no matter how the hurdle of construction may be passed, the rule nevertheless would achieve its purpose thereafter within the trial judge's duty during the course of a retrial or rehearing to follow that which the appellate court had determined where the evidence is substantially the same as it was before the upper court. For example, if an appellate court instead of merely settling one group of issues settled them all by either entering its own decree (see R. L. H. 1935, § 3563) or affirming that of the trial judge, no one would deny that the law for that case would have been definitely settled, unless disturbed by the circuit court of appeals. So by the same token, if an appellate court settled some of the issues and reversed the trial judge's decree for the purpose of having him decide the remaining issues from additional evidence to be supplied, its determinations

within the rule would be equally conclusive upon the settled issues on the original evidence as well as in respect to the principles governing the rehearing of remaining issues on additional evidence, its conclusions of law being just as final to that extent as an opinion would be to the character of a decree which it had directed to be entered below. (See *William Wrigley, Jr., Co.* v. *L. P. Larson, Jr., Co.*, 5 F. [2d] 731; *Lewis* v. *Barnes, supra.*) Indeed, without such a rule and its applications, it would be useless for an appellate court to write an opinion.

In this case the rule is urged against the court below. Whatever the trial judge's construction of the mandate was in relation to the scope of the rehearing, the record shows that the parties themselves invoked the rule at the outset by stipulating that the identical evidence, which had been before this court on writ of error in the form of the record of the hearing, including the transcript of evidence adduced, be admitted into evidence, and by not only failing to offer and adduce any other proof of fraud but by declining to do so. Clearly in such a situation if fraud had been affirmed, it would not be considered as error by this court on any method of appeal. (See *Notley* v. *Brown*, 17 Haw. 455.) On the other hand, the trial judge's reopening and disaffirmance thereof was a violation of the rule of the case and would be considered as error regardless of the mode of appeal, he being limited to the identical evidence upon which fraud had been settled by this court and no appeal therefrom having been taken. (See *Casals* v. *Fernandez*, 40 F. [2d] 831.)

There is no question that this court has the power of re-examination in this appeal. Such here will be exercised sparingly on the court's own volition, the application of the rule in regard thereto involving good practice only, not jurisdiction. Its exercise in this case, however, is not made because of any manifest error in this court's previ-

ously determined holding, but on the contrary, to ascertain whether the error committed thereafter by the trial judge in disregard thereof is prejudicial. Should the appellate holding be found valid, other phases of the appeal would require its amplification, this court being constrained to enlarge upon it by reason of the cogent importance such would bear to the law of fiduciary trusts generally.

Upon re-examination, this court not only finds no error in its holding on first review but affirms that the alienation was a wrongful appropriation by the respondents of property entrusted to an assignee for benefit of creditors, in that they committed a constructive fraud as well as intentionally perpetrated an actual fraud, the findings of fact herein being that the transfers circuitously conveyed the assigned property to the respondents in consummation of a prearranged plan, and constituted both a purchase by the assignee, jointly with Davenport, and a sale in which the assignee was personally interested. There is no dispute in the record that such was transacted without the consent of the creditors or the approval of a court of competent jurisdiction; nor do there arise questions of ratification, laches, estoppel or a bona fide purchase without notice.

In relation to the fact of purchase by and in the interest of the assignee, there is nothing in the law of fiduciary trusts that is more firmly settled than that a fiduciary shall not be allowed to thus serve himself while ostensibly serving the beneficiaries. The prohibition extends to every type of fiduciary. "A receiver, trustee, attorney, agent, or any other person occupying fiduciary relations respecting property or persons is utterly disabled from acquiring for his own benefit the property committed to his custody for management. * * * The rule stands on the moral obligation to refrain from placing one's self in positions which ordinarily excite conflicts

between self-interest and integrity. It seeks to remove the temptation that might arise out of such a relation to serve one's self-interest at the expense of one's integrity and duty to another, by making it impossible to profit by yielding to temptation. It applies universally to all who come within its principle." *Gilbert* v. *Hewetson*, 79 Minn. 326, 82 N. W. 655, quoting with approval *King* v. *Remington*, 36 Minn. 15, 29 N. W. 382. (See *Turner* v. *Fryberger*, 94 Minn. 433, 103 N. W. 217.) The rule applies with equal force to a fiduciary who purchases trust property jointly with another. (See *Saltmarsh* v. *Beene*, 4 Porter 283 [Ala.], 30 Am. Dec. 525.) It is a salutary rule, designed to protect the weak and incompetent from the encroachment of the strong and artful. It rests upon two principles. One is that a trustee or other fiduciary has no right to speculate upon the confidence in him imposed or derive any personal advantage from his confidential relationship, since all his skill and labor is required to be directed toward the advancement of the purposes of the trust and the best interests of the beneficiaries. The second is that he is not permitted to create in himself an interest opposite to that of the party for whom he must act, for no man can faithfully serve two masters whose interests are in conflict. (See *Guardianship of Anna T. K. Parker*, 14 Haw. 347, 359, 360; see also *Estate of Isenberg*, 28 Haw. 590, and *Isenberg* v. *Trent Trust Co.*, 26 F. [2d] 609.)

An assignee for benefit of creditors is a fiduciary upon whom is devolved the duty to exercise the utmost of good faith with respect to such creditors in selling the assigned property. The duty cannot be evaded nor the rule circumvented by a series of conveyances or by the device of indirect acquisition through stock ownership, it being a well-settled principle of law that a man cannot do indirectly that which to do directly would be unlawful. (See

*McCord* v. *Nabours*, 101 Tex. 494, 109 S. W. 913, modifying 103 S. W. 469; *In re Sheldon*, 76 N. Y. S. 278, 72 App. Div. 625; *Borders* v. *Murphy*, 125 Ill. 577; *Saltmarsh* v. *Beene, supra*, and 26 R. C. L. § 192, p. 1329, for collection of authorities.) A devious purchase or circuitous acquisition as here accomplished by the assignee in conjunction with the other respondents is therefore not only obnoxious to every objection against a direct purchase or open attainment, but odious with a force increased in vigor by the added difficulty of detection.

Although the law construes every such breach of trust, whether intentional or not, to constitute a constructive fraud and the nature thereof to be fraudulent, it may or may not constitute actual fraud, the efficacy of the rule not being dependent upon the existence of actual fraud, the bad faith of the fiduciary, or inadequacy of the purchase price. The following statement of the law is illuminating: "The rule forbidding a trustee to purchase property does not rest, to any considerable extent, on the fact that in a particular line of cases the trustee has peculiar opportunities for the practice of fraudulent acts with regard to the property in his charge. The rule, to be efficacious, must be general, and the law implies, therefore, that in all cases of trusts such opportunities may exist, and consequently the prohibition is universal that he may not do anything which, while it is an advantage to himself, is or may be a loss to the trust estate. The rule is entirely independent of the question whether in point of fact any [actual] fraud has intervened. It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form." 26 R. C. L. § 191, p. 1328. (See authorities therein cited.)

It may therefore be laid down as a general rule of law that an assignee for benefit of creditors cannot, either in-

tentionally or unintentionally, directly or indirectly, purchase or be interested in the purchase of the assigned property except with the consent of the creditors or by the express approval of a court of competent jurisdiction. In a case where he does act contrary to the prohibition, the law regards the transaction to have been made in his character of assignee for the benefit of creditors, subject to approval or repudiation by interested parties of the trust estate in the proper exercise of their option. The prohibition, however, is absolute. For the invocation thereof, it is not necessary for the objecting parties to show actual fraud, nor permissible as a defense for the assignee to show good faith. (See *Wilcox* v. *Marshall*, 2 Haw. 296, 302, 303; *Guardianship of Anna T. K. Parker*, *supra*; see 6 C. J. S. § 204, p. 1346, for collection of authorities. See also *Hitchcock* v. *Hustace*, 14 Haw. 232; *Estate of Isenberg*, 28 Haw. 590, 672; *Guardianship Richard Smart*, 32 Haw. 943.)

In view of this well-settled doctrine of law as a part of this court's determination, the error of reopening, followed as it was by the error of a contrary finding, is prejudicial and calls for the reversal of the trial judge's decree. Specification one is sustained.

The case was primarily remanded for the purpose of ascertaining the amount to be recovered, which was dependent upon evidence to be supplied of the value of the assigned property, together with any profit accruing to it from the enterprise upon which it had been launched. Such additional evidence having been adduced at the rehearing, this court is now in a position to determine that amount. Notwithstanding the fact that the trial judge's findings of the validity of the sale to Davenport precluded a proper approach to the question, this court will make its own findings within its province so to do, as with all other findings herein, the appeal being from a circuit judge at

chambers. (See *Lalakea* v. *Laupahoehoe S. Co.*, 33 Haw. 745.)

The objecting creditors as interested parties of the trust estate have repudiated the transaction by which the assigned property was alienated. The conveyances, therefore, constituting as they do a purchase by the assignee and a sale in which he was personally interested, should be set aside.

As a matter of fact, however, the assigned property cannot be restored because, although it was transferred as a unit to the respondent corporation, it thereafter completely lost its identity in an amalgamation of assets which extinguished all trace thereof. Therefore, lest the respondents be permitted to realize the wrongful purpose of their misappropriation, the estate is entitled to a money award (see *State Bank of Round Lake* v. *Riley*, 224 N. W. 237 [Minn.]) to the extent of its interest, which in the nature of things would be proportionate in the venture into which it has been merged. Such an interest may be defined as a "co-ownership" in the mingled *res*, as expressed by Judge Learned Hand in *Primeau* v. *Granfield*, 184 Fed. 480, cited by this court in its previous discussion of the beneficiaries' right of recovery of misappropriated property mingled with that of the trustee. (See *Dress Mfg. Co.* v. *Cadinha, supra.*) The fact that the enterprise is a corporation simplifies the problem of ascertaining the proportion, one element being whether stock was issued at par in exchange for the assigned property at the time it was inducted intact into the corporation.

The respondent corporation issued its entire capitalization in the sum of $25,000 as fully paid stock at par, $14,000 thereof representing an issue purchased by new capital or assets, consisting of cash and notes as distinguished from the assigned property, leaving $11,000 of issued stock for the consideration of which there must be

an accounting. It is undisputed that the respondents continued the business of the assigned property and that at the time it was conveyed to the respondent corporation and all corporate shares of stock had been issued, the stock in trade, fixtures and improvements, which comprised the corporation's merchandise business and all that enabled it to function as such aside from the new capital, was that of the assigned and transferred property. Also undisputed is the fact that the addition of new capital thereto was invested in the respondent corporation to carry on and enlarge that business. Thus there is a strong presumption that the consideration for the $11,000 issue of stock, as the complement of the $14,000 issue, was the transfer of the assigned property.

The respondents having the duty to account have also the burden to rebut this presumption of fact. They attempt to do so by claiming that the $11,000 of stock was issued for Cadinha's and Davenport's assumption of the respondent corporation's liabilities. Although the corporation's books show that their personal accounts were debited with some payments of principal toward these liabilities, they also show that the corporation continued to pay the interest thereon. This payment of interest exceeds that of principal and stands unexplained. It not only discredits principal payments as evidence of a bona fide assumption of liabilities, but in our opinion indicates that the liabilities remained those of the corporation. This indication is strengthened by the fact that on one hand the claimants to such an assumption are misappropriators of trust property, and on the other that the liabilities are those of an entity which in substance consists of the claimants and at the same time is an instrumentality of their fraud, thereby placing the respondents in a position to simulate principal payments to escape the reality of their fraudulent actions. Consequently, the evidence

of assumption is untrustworthy and insufficient to rebut the presumption, the respondents having demonstrated their lack of good faith. Hence their claim, in the absence of credible evidence to the contrary, must be deemed to be fictitious and feigned in line with their whole scheme to cloak by subterfuge their wrongful appropriation. Therefore the presumption prevails, the respondents not only having failed to sustain their burden to rebut it, but their equivocal attempt itself being suggestive of the fact that the $11,000 issue of stock was made for the assigned property.

Such fact thus affirmatively appearing, the $11,000 issue tended to gauge the comparative value of the assigned property at its induction as attributed by the respondents in relation to the whole enterprise, the ratio being 11,000/25,000 or 11/25. They, being presumed to have observed the substantive rule of law that fully paid corporate stock at par be issued for cash or its equivalent in value, will not be heard to assert that the valuation, fixed by the stock issue, was inflated. (See *Planters' Operating Co.* v. *Commissioner of Int. Revenue,* 55 F. [2d] 583; *Sioux City Stock Yards Co.* v. *Commissioner of Int. Rev.,* 59 F. [2d] 944; see also R. L. H. 1935, §§ 6714, 6751.) Further, such valuation is substantiated by ample evidence including the admissions of Cadinha and although the voluminous record presents other modes of ascertaining the amount of recovery, the value admeasured by the stock issue, thus supported, should be taken as a criterion rather than any other because it is the only one capable of producing a clear-cut and exact result, the law being that where there is a variety of ways of estimating the amount of recovery the mode which is more definite and certain must be followed. (See *Rilovich* v. *Raymond,* 20 Cal. App. [2d] 630, 67 P. [2d] 1062; *Kinkead* v. *Lynch,* 132 Fed. 692.) In this case, the stock issue not only established a

direct and positive value and the best and most satisfactory means of reaching a precise recovery but it also has the distinguishing feature of having been made under compulsion of law to render a true valuation by the respondents themselves before any controversy arose, Davenport at the time being an expert therein. Both he and Cadinha possessed intimate knowledge from which they were in a position to ascertain the value of the assigned property and significantly appeared satisfied to match the valuation reflected by the measure of the issued stock with that of their own cash and assets. Consequently the admeasured valuation may be taken as the key to the comparative value of the assigned property, it being the best proof thereof in the record, as well as being otherwise established by substantial evidence. Such a method lends itself readily to the purpose and in our opinion is an eminently fair means of estimating a proportionate interest.

This not being an action to recover the purchase price with interest, the time of the hearing, in this case taken as of May 13, 1933 (to which there is no dispute, it also being the date of the last valuation and inventory of the respondent corporation), establishes the measure of damages rather than the time of the original misappropriation. (See *Boothe* v. *Fiest, et al.*, 80 Tex. 141, 15 S. W. 799; *Mixon* v. *Miles, et al.*, 92 Tex. 318, 47 S. W. 966; *Lingo Lumber Co.* v. *Harris*, 11 S. W. [2d] 589 [Tex. Civ. App.]; *McCord* v. *Nabours, supra.*)

The evidence is undisputed that from the time of the misappropriation to and including the date of the hearing no other new capital or assets were added to dilute the original comminglement or change the ratio of values. On May 13, 1933, we find that the net worth of the respondent corporation was $14,651.36, taking into consideration its liabilities which Cadinha and Davenport purported to assume and all credits due them. Thus 11/25ths

of $14,651.36 equals $6,446.59 and represents the net value of the estate's co-ownership in the respondent corporation at the time of the hearing, or the net proportionate interest therein which the estate is entitled to recover from the respondents. If the amount of $1,754.75, which Cadinha received as a part of the purchase price from the Davenport sale and which was distributed by Cadinha in reduction of creditors' claims against the estate, was entirely new capital, it should be credited in reduction of the amount of recovery. However, the evidence conclusively shows, and we so find, that although the amount was raised in the name of the assigned business, it was repaid from the merged enterprise. Hence new capital in the merger directly participated in the repayment, thus indirectly contributing toward the payment by Davenport and the distribution by Cadinha in proportion of its investment to the whole. The total investment was $25,000, $14,000 of which being new capital. Consequently, 14/25ths of $1,754.75 equals $982.66 as the new capital's contribution, which as a credit reduces the recovery to which the estate is entitled to $5,463.93.

Specification five presents the question of compensation for the assignee's services by alleging error in the refusal to surcharge the commissions taken by him. That question was not before this court on writ of error, but was later placed before the trial judge on rehearing by the petitioners within the issues created by the pleadings and without any objection whatsoever on the part of the respondents, the petitioners urging that it was material to the amount of recovery. Dealing as it did with a recoverable amount, the urged question was material and, in that it was not previously before the appellate court, did not come within the rule of the case (see *Wong Wong* v. *Skating Rink, supra*). It therefore was proper for the trial judge to entertain the question within his duty to ascertain the complete amount to be recovered, the re-

spondents waiving any right they may have had to exclude it. However, to this question the issue of actual fraud is germane and, although the question itself did not come within the rule, the issue did, the parties as already pointed out invoking the rule by limiting the trial judge to the identical evidence in regard to which actual fraud had been appellately settled. Consequently his contrary finding on the issue being prejudicial error, the trial judge's disposition of the question of surcharge upon it was likewise error. So again this court makes its own findings.

From the record, it is impossible to say when actual fraud commenced to take form and Cadinha began to prepare the way for the ultimate misappropriation of the property after it was entrusted to his management. Nevertheless, it is clear that his wrong against the estate was not a sudden assault, but one that developed slowly upon a carefully prearranged plan, as indicated not only by his conspiracy with Davenport, but also by other breaches of trust such as his buying at discount creditors' claims (see *Petrie* v. *Badenoch*, 102 Mich. 45, 47 Am. St. Rep. 503, 60 N. W. 449), his personal guarantee of obligations of the assigned business which he was not authorized to do under the assignment, his failure to diligently seek the highest purchase price (see *Ulrich* v. *Hite*, 35 Haw. 158) and his endorsement of a note of the assigned business to finance its sale to Davenport (see *McCord* v. *Nabours*, 101 Tex. 494, 109 S. W. 913), placing him as assignee in a position antagonistic to that of the creditors and inconsistent with that of a fiduciary. Such continuing conduct in conjunction with his part in the subsequent tortuous alienation of the assigned property presents a clear picture of the nature of the actual fraud perpetrated which, had it not been detected, would have permanently obliterated the entire estate. Indeed, his actions were so equivocal and the business entrusted so complicated that his

resultant fraud therein not only precipitated the instant litigation, together with all its confusions and controversies, but also created the danger of some of the equities of the estate being lost forever in the maze of his adroit but disloyal dealings, both before and after the actual misappropriation. Under such circumstances, Cadinha has forfeited all right to compensation, his disloyalty tainting the entire motive of his services and throwing it under a justifiable suspicion. Justice, therefore, demands that he be paid nothing as remuneration from the estate which he sought to destroy, it being a well-established rule of law that any compensation for services of a fiduciary depends upon the proper and faithful execution of his trust. (See *In re Estate of Akana*, 11 Haw. 420, 422; *Estate of Lalakea*, 26 Haw. 243, 274; *Re Trask Minors*, 27 Haw. 343, 361; *Estate of Isenberg*, 28 Haw. 590, 684.) He should therefore be surcharged $8,836.27, being the full amount of the commissions taken by him from the estate as compensation for his services, as well as for any commission taken on the sale to Davenport.

Cadinha, however, did not stand alone in the perpetration of fraud. Davenport, during the greater and culminating part of Cadinha's tenure as assignee, actively participated and connived in the fraud, the respondent corporation being merely their instrumentality to consummate it. For this part of his tenure, Cadinha assessed against the estate the sum of $4,500 which he accumulated as a credit on the books of the assigned business. He later accepted a note for such credit from the respondent corporation. In lieu of payment thereof he received from the corporation a $4,500 block of its stock and canceled the note, thus investing the commissions. Hence of the total surcharge against Cadinha $4,500 should run against all the respondents jointly and severally, leaving the balance to run solely against Cadinha. Specification five is sustained.

Specification eight alleges error in the amount awarded to the master' for services rendered at the hearing and rehearing, the petitioners claiming that $3,000 is exorbitant. Both parties left the ascertainment of the amount to the trial judge and the record does not disclose that he improvidently exercised his discretion in relation thereto nor have the petitioners shown an abuse thereof. The specification is therefore without merit and the award should stand as a part of the costs to be assessed, the respondents as the parties liable having raised no objection thereto.

It is apparent that the estate's proportionate interest in the net worth of the respondent corporation and the surcharges against the respondents entitle it to recover an aggregate amount, together with lawful interest from May 13, 1933, in excess of the balance of the petitioners' claims against it. Such being the case, it may be advisable to appoint a receiver for its collection and distribution. In respect thereto, no evidence has been adduced below upon which to determine whether such a course may be necessary nor what the rights of interested parties other than the petitioners may be. However, the record does not indicate that such evidence cannot be readily adduced. Consequently for the purpose of impounding such an excess and its final distribution, the case is remanded below for a further hearing.

No specifications other than those already dealt with herein warranting consideration, the appeal is sustained, the decree reversed and the cause remanded to the trial judge with instructions to grant a further hearing to settle all questions of distribution and to render a final decree against the respondents consistent with this opinion.

*M. K. Ashford* (*Thompson & Russell* and *W. B. Stephenson* with her on opening brief; *F. E. Thompson* with her on closing brief) for petitioners-appellants.

*T. M. Waddoups* (also on the brief) for respondents-appellees.