**E. Warren WILLARD et al., Plaintiffs,**

v.

**CITY AND COUNTY OF HONOLULU, Frank F. Fasi, Mayor of the City and County of Honolulu, and William S. Johnson, Individually and as Director of Finance, City and County of Honolulu, Defendants.**

**Civ. No. 70–3141.**

United States District Court, D. Hawaii.

Feb. 25, 1971.

Paul F. Cronin, Pratt, Moore, Bortz & Case, Honolulu, Hawaii, for plaintiffs.

J. Russell Cades, Peter C. P. Char, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, for intervenor Hawaiian Life Ins., Co., Ltd.

Paul Devens, Corp. Counsel, George H. Lehleitner, Jr., Deputy Corp. Counsel, City and County of Honolulu, for defendants.

## DECISION ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE MEMORANDUM OF INTERVENOR

PENCE, Chief Judge.

Pursuant to proper resolutions authorizing issuance and sale thereof by its Council in 1964, 1965 and 1968, the City and County of Honolulu [City] issued and sold the following Improvement District Bonds:

| | |
|---|---|
| 152 Palolo Valley | — Redeemable after Feb. 5, 1965 |
| 5% | — Payable Feb. 5, 1983 |
| 162 Kahaluu Cutoff Road | — Redeemable after June 1, 1965 |
| 5.5% | — Payable June 1, 1983 |
| 184 Manoa Road | — Redeemable after Dec. 1, 1966 |
| 5% | — Payable Dec. 1, 1984 |
| 186 Lunalilo Home Road | — Redeemable after Mar. 15, 1967 |
| 5.5% | — Payable Mar. 15, 1985 |
| 203 Manana Subdivision #2 | — Redeemable after Sept. 15, 1969 |
| 5.4% | — Payable Sept. 15, 1987 |
| 207 Moanalua Road | — Redeemable after Oct. 15, 1969 |
| 6% | — Payable Oct. 15, 1987 |

Plaintiffs are all purchasers and holders of those bonds, and for themselves and all other holders of the same brought this class action to compel the City to redeem bonds in numerical order for each district, as collections allow, out of all payments on the assessments in excess of that needed to meet the interest due on the several bond issues. This was the procedure followed by the City in redeeming these bonds prior to 1969.

Beginning in 1969, the City stopped so redeeming the bonds and did not channel the assessments, as paid, into the "Improvement District Bond & Interest Redemption Fund" and (as indicated above) did not redeem in numerical order such improvement bonds as severally permit-

ted by the moneys in the Fund. Instead, the City lumped the excess of such assessment payments, over that necessary to pay interest, in with moneys coming into the City's treasury from a multitude of its other funds and invested the same in bank time certificate deposits in local banks, or in U. S. Government obligations, i. e., short term Treasury bills.[1] The bank deposits are secured by obligations of other states and municipalities.

Due to the tight money market, the Treasury bills returned from 5.35% to 7.6% and the bank certificates of deposit returned from 6.25% to 7.5% during 1969–70. The City then kept for itself,[2] as "profit" on such "reinvestments", all over the interest due on the several improvement district bonds.

Plaintiffs urged that this procedure violates the City's contracts, and implied warranties thereon, with the bondholders. They contend that the City is bound by contractual, trust, and other duties to pay principal and interest on improvement district bonds whenever money received through collection and payment of assessments is available for that purpose. Plaintiffs also seek seriatim redemption of the bonds as funds allow, an accounting of profits, damages for loss of use of money due them, along with attorneys' fees, costs, etc.

The City admits that collected assessments have not been applied solely to the payment of interest and principal on the bonds in question, but, as indicated *supra*, all payments in excess of interest due have been invested in United States Treasury bills and bank time certificates of deposit. The City maintains, however, that any payment of principal on the bonds in question before their stated maturity date lies solely within its discretion and that it may meanwhile invest such funds for the benefit of a revolving fund servicing *all* the City's improvement district financing ventures.

After extensive discovery, plaintiffs have moved for a partial summary judgment, i. e., a judgment in favor of plaintiffs on all issues except the amount of damages. The court finds that, except for the damage issue, there remain no questions of fact for the court to decide. The legal issues are: (1) what was the parties' contractual intent with respect to payment of the bonds?; (2) what is the nature and extent of the trust duties, if any, imposed on defendant with respect to monies received for payment of such bonds?

## I. *Contractual Intent*

Each of the bonds contains the following language:

"THE CITY AND COUNTY OF HONOLULU does not otherwise guarantee the payment hereof. This bond is not a general debt of the City and County, nor based upon the credit of the public domain, nor chargeable against the general revenues of said CITY AND COUNTY * * *." [3]

Bonds for Improvement Districts 203 and 207 state:

"*This bond and the issue of which it is a part are payable exclusively out of moneys to be collected or paid* on account of the assessments against the several properties contained within [the district] * * *. The said City and County hereby promises to cause said unpaid assessments to be collected or paid *with such collections or payments to be applied solely to the payment of interest and principal on the bonds* issued for said Improvement

---

1. The City's books at all times accurately reflected the paid-in status of all assessment on each of the bond issues, and the exact status of the "reinvestments."

2. All "profit" on interest was paid into a Revolving Fund used for shoring up the financing of *all* the City's improvement districts.

3. I.D. Bonds for districts 203 and 207 add the following phrase: "nor has it been specifically authorized by the voters of said City and County as part of a general indebtedness."

District until such interest and principal are fully paid, and will otherwise perform all its obligations as required by law." (Emphasis added.)

Similarly, bonds for Improvement Districts Nos. 151, 162, 184 and 186 contain the following:

"The City and County of Honolulu hereby promises, for valuable consideration, to cause said unpaid assessments to be collected or paid *and kept* in the Improvement District Bond & Interest Redemption Fund *to be applied solely to the payment of interest and principal on the bonds* issued for said Improvement District until fully paid, and will otherwise perform all its obligations * * *." (Emphasis added.)

■ As the wording of each of the bonds in question makes clear, Honolulu Improvement District Bonds are special, rather than general obligations of the issuer. They are neither a general debt of nor a personal liability against the City, and are not secured by a pledge of the full faith and credit of the City, as issuer. Rather, such bonds are payable only from special assessments for local improvements and are secured only by liens—or by payments in release thereof —against the assessed property. This is not only the bondholders sole security, it is also the security to which they are specifically entitled.

In Honolulu, improvement districts are created and assessments against property fixed by ordinance. An affected property owner is given a 30-day period in which either to pay the special assessment in full or to elect to pay it in installments, with interest, over a period of twenty years. The receipts from property owners who pay in full are placed in the Improvement District Assessment Fund [Assessment Fund], the primary working account of the improvement districts. It is the receipts from property owners who elect to pay the special assessments in installments that pay off the interest and principal of that improvement district's bonds.

The City Council authorizes the issuance of these I.D. bonds, setting forth in detail the terms and conditions of the bonds as authorized, the procedures for sale, and the contract terms to be printed in the bond certificates. The proceeds from the sale of these bonds are also placed in the Assessment Fund and are there held for that district's construction payments.

On April 11, 1963, under Ordinance No. 2331, the Assessment Fund was established pursuant to Article 20 of Chapter 9, Revised Ordinances of Honolulu 1961. That Article, in describing the purpose of this fund, provides:

"All moneys collected by the Director of Finance of the City and County of Honolulu for assessments levied by each improvement district assessment ordinance and the proceeds of all bonds sold to cover the cost of improvements in each improvement district, shall be placed in the Improvement District Assessment Fund; *provided, however, all moneys collected on account of assessments and interest for any improvement district after the issuance of any improvement district bonds shall be applied solely to the payment of interest on and principal of such bonds until such bonds have been paid.*" (Emphasis added.)

This ordinance stemmed from a State statute, § 153–26, R.L.H.1955, pertaining to Improvement by Assessment on Oahu.

To implement the above proviso, the City set up an Improvement District Bond & Interest Redemption Fund into which the post-bond-issue collections on assessments were ultimately to be funneled.

Council Resolutions 7 and 163 of 1964 provided that:

"The CITY AND COUNTY OF HONOLULU hereby promises, for valuable consideration, to cause said unpaid assessments to be collected or paid *and kept* in the Improvement District Bond & Interest Redemption Fund *to be applied solely to the pay-*

*ment of interest and principal* on the bonds issued for said Improvement District until fully paid, and will otherwise perform all its obligations as required by said Chapter 24 of the Revised Ordinances of Honolulu 1961, as amended, and Section 153–3 of the Revised Laws of Hawaii 1955, as amended." (Emphasis added.)

By Council Resolutions 383 and 386 of 1965, the following covenant was made by the City concerning the unpaid assessments in Improvement Districts 184 and 186:

"The CITY AND COUNTY OF HONOLULU hereby promises, for valuable consideration, to cause said unpaid assessments to be collected or paid *and kept* in the Improvement District Bond & Interest Redemption Fund *to be applied solely to the payment of interest and principal* on the bonds issued for said Improvement District until fully paid, and will otherwise perform all its obligations as required by said Chapter 24 of the Revised Ordinances of Honolulu 1961, as amended, and the Charter of the City and County of Honolulu." (Emphasis added.)

By Council Resolutions 304 and 336 of 1968, the following covenant was made concerning the unpaid assessments in Improvement Districts 203 and 207:

"The said City and County hereby promises to cause said unpaid assessments to be collected or paid with such collections or payments *to be applied solely to the payment of interest and principal* on the bonds issued for said Improvement District until such interest and principal are fully paid, and will otherwise perform all its obligations as required by law." (Emphasis added.)

Literature describing improvement district bonds for Improvement District No. 186 contains the following language in the paragraph concerning security:

"Moneys to meet the payment of interest and principal on the bonds issued are derived from annual collections of assessments and interest, *and kept in a special fund to be used solely for the payment of such interest and principal.*" (Emphasis added.)

The pre-1969 practice of redemption was so embedded into the bond sales structure that low numbered bonds actually sold at lower prices than high numbered bonds, because it was an accepted fact in the bond market that the lower numbered bonds would be redeemed earlier, and their shorter maturity would result in a lower yield to the buyer.

In the face of the precise wording of the State statute, of Ordinance 2331, of the Council Resolutions, and of the language on redemption in the bonds themselves, as well as the bond sales literature, bond market pricing practice, and the City's actual procedure prior to 1969, the City nevertheless defends its current practice by pointing out that (1) the improvement district bond certificates state: "THE CITY * * * reserves the right to redeem this bond * *." Council Resolution 7 of 1964 says the same and further provides: "That the bonds of this issue shall be * * * payable February 5, 1983, and subject to call on February 5, 1965, or at any time thereafter * * *." Other Council Resolutions contain similar language for the other districts; (2) all bonds have fixed maturity dates; and (3) the evolution of the Redemption Fund shows that early redemption lies within the discretion of the City. Thus, the City quotes Ordinance 2477 of 1964:

"Section 8–16.1 Creation. There is hereby created and established a special fund to be known as the 'Improvement District Bond and Interest Redemption Fund.' The Director of Finance shall transfer from the Improvement District Assessment Fund into the 'Improvement District Bond and Interest Redemption Fund' such moneys as are required for the payment of principal and interest on the bonds * * * when the same become due and payable."

The City urges that the history of the ordinances and resolutions surrounding the evolution of this fund indicate that the words "shall transfer" and "when the same become due and payable" mean that the Director of Finance may, just as the Council was theretofore authorized,[3A] exercise his discretion as to the time of redemption of the bonds.

The City's position gives a strained construction to the words in question. Read in the context of the wording of the bonds, the City's right of redemption is in no way inconsistent with the bondholders' right to payment before maturity date. The City's right to redeem bonds is a right it can exercise in advance of maturity date whenever money is available for such action, irrespective of the source. The City's right so to redeem is not at all in issue here.

▮ Neither is the existence of a fixed maturity date inconsistent with earlier payment.[4] Where funds are not available for earlier payment, the maturity date does but determine the point in time at which the bonds may be said to be in default and the bondholders' rights attendant thereto accrue.

The validity of the City's "evolution of the Redemption Fund" theory is subject to doubt,[5] but even if correct, that theory does but show the *internal* housekeeping procedures for the City. It does not and cannot change the clear and long manifested interpretation of the contractual words of the bonds themselves.

The language of the bonds make it palpably evident, without ambiguity, that the bonds are to be paid solely, i. e., exclusively, out of funds received through collection or payment of assessments. Improvement district bonds for Districts 151, 162, 184 and 186 make this even clearer by specifically mentioning the Redemption Fund, a creature of accounting technique designed to facilitate the payment of bonds. The language employed in the bond, as well as the literature describing the issue for Improvement District 186, reinforces this position, at least with respect to that district, by stating that assessments are to be *kept* in a special fund and *used* to pay bonds. The City ordinance and State statute upon which it is based, the resolutions set out above, the bond sales literature, the bond market pricing, as well as the City's own pre-1969 redemption practice, all make manifest that the intent of the contracting parties, the City and the bond buyers, was that the bonds would be redeemed by the City as money was made available by the payment of assessments.

It is obvious, therefore, that the City's investment program, now attacked, flies in the face of its contractual obligations to the plaintiffs, as described above. It is solely to assessment revenue rather than the City's investment return that the bondholders in this action are entitled to look for payment of their bonds.

While, arguably, the above concept might be construed to refer to the source of payment of the bonds (assessment fund rather than investment proceeds) rather than to the timing of such payment, the realities of improvement district bond financing indicate that, once the source of payment is decided, the timing of such payment is determined as well. When the assessment on a property is paid in full, the City no longer receives interest on that assessment. Nevertheless, bonds corresponding in amount to that (then paid up) assess-

---

**3A.** Ordinance No. 2443 (1962), the predecessor to Ordinance 2477 of 1964, provided:

"Section 8–16.1 Creation * * *. Pursuant to 24–5.5 of R.O.1961, the Director of Finance shall transfer into the 'Improvement District Bond Redemption Fund' such moneys as are required by the provisions of said section to be set aside in a special deposit for the redemption of bonds *authorized to be redeemed by the Council.*" (Emphasis added.)

4. See City of Sterling v. Comm'l Sav. Bank of Sterling, 116 Colo. 369, 370, 181 P.2d 361, 362 (1947).

5. Permissive or mandatory character of legislation in relation to payment of public debts, 103 ALR 812 (1936).

ment remain outstanding and continue to draw interest. The financing scheme for the bonds clearly shows that the City, having a right to redeem in advance of maturity date, was to terminate any such interest drain by exercising that right.

## II. *Breach of Trust*

■ Moneys collected by the officers of a municipality in payment of special assessments levied for improvements constitute a trust fund; the municipality, although having title to the fund, is a trustee for the bondholders and is charged with all attending fiduciary duties.[6]

■ As this court analyzes the complex of factors defining the City's contractual duties to the bondholders, it can only conclude that the City obligated itself to act as collection agent of the bondholders and to transfer assessment payments into the Redemption Fund for redemption of bonds as money became available for that purpose. This, the City has failed to do and accordingly has breached its trusteeship duties to plaintiffs.

■ Moreover, the City has breached its fiduciary's duty of loyalty to plaintiff bondholders by embarking upon the investment program earlier described. It is well settled law that a trustee is under a duty to direct his skill and labor toward the advancement of the purposes of the trust and the best interest of the beneficiaries.[7] Here, in embarking on an unauthorized investment program with the trust funds, for its own general benefit, it has violated its fiduciary duty of loyalty to the bondholders—even though it has acted in honest belief in the legality of its investment proce-

dures.[8] While it is true that the "profits" realized from the City's investments do not at this time directly benefit the City itself, nevertheless since the "profits" from its investment program go into a Revolving Fund to shore up improvement district operations as a whole, it is the bondholders in other improvement districts, the city contractors, the property owners in other improvement districts, and conceivably even the City itself that stand to benefit from any surplus which might develop in the Revolving Fund.

■■ The City gains no "gold stars" by its claim that it was in fact giving better and a higher quality security to the bondholders by investing in U. S. Treasury bonds and bank time deposits. Without discussing the "security" aspects of U. S. obligations, admittedly the bank time deposits are secured by *other* state and municipal obligations, the "security" factors of which were in fact unknown to the City itself. But the City was under no obligation to attempt to give the bondholders any better security than they bargained for—liens on the assessed property. Moreover, the bondholders had a *right* to have *that* specific security. That the City or finance experts might say that any other security was "better" is of no moment. It was the City's duty to maintain for the bondholders the security to which they were legally entitled by the terms of the bonds. The City had no right to make unilateral innovations affecting such security.[9]

## III. *Relief*

■ The plaintiffs are entitled to specific performance of the contract between the parties to this action, and it is ORDERED that all assessment payments on the bonds here involved, collected and

---

6. See First Nat'l Bank & Trust Co. of Racine v. Village of Skokie, 190 F.2d 791 (7 Cir. 1951), cert. denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952); 15 McQuillin, The Law of Municipal Corporations, § 43.136 (3d rev. ed. 1970).

7. *Cf., e. g.,* Mid-Pacific Dress Mfg. Co., Ltd. v. Cadinha, 36 Haw. 732, 742

(1944); In re Guardianship of Richard Smart, 32 Haw. 943, 948 (1934).

8. See Steiner v. Hawaiian Trust Co., 47 Haw. 548, 393 P.2d 96 (1964).

9. *Cf.* Gamewell v. City & County, 33 Haw. 817, reh. denied, 34 Haw. 8 (1936).

paid into the Improvement District Assessment Fund and heretofore "invested" by the City and all such payments hereafter made, are to be transferred to the Improvement District Bond and Interest Redemption Fund to be applied *solely* to the payment of principal and interest on the specific bonds involved in this action.

The court further orders that an accounting be made by the City to plaintiff bondholders detailing the manner and results of its investment of assessment money received from property owners in the improvement districts involved in this case.

▇ Because of defendant's breach of its trust duties, plaintiffs are entitled as a matter of law to any profit such an accounting might reveal.[10] (This is not to be construed as setting a limit upon the damages which plaintiffs may possibly show to have resulted from defendant's breach of its contractual and trust duties.)

Plaintiffs' motion for partial summary judgment on the issue of liability is hereby granted.

### ADDENDA

Defendant has moved to strike the memorandum of intervenor Hawaiian Life Insurance Co., Ltd., filed with this court November 23, 1970. The City claims that this memorandum is unsolicited and that it contains new matter which comes as a surprise to defendant.

At the close of the argument on plaintiffs' motion for partial summary judgment the court gave permission to the City to file certain opinions of its bond counsel upon which, it was alleged, the actions of the City were partially based. The court also gave permission to intervenor Hawaiian Life to file its response to these opinions. No time limit was set for either of these filings.

It is thus not true that Hawaiian Life's memorandum is unsolicited. It is true, however, that Hawaiian Life has gone somewhat beyond the limits of mere response to defendant's opinions of bond counsel. This surplusage merely reiterates what has already been set out by the parties in written and oral argument. It most certainly does not contain any "new matter" such as would surprise and therefore prejudice defendant in the disposition of this case, nor has it done so. Accordingly, defendant's motion to strike is denied.

---

10. *Cf. Lynn v. City of Longview,* 15 Wash.2d 528, 131 P.2d 164 (1942); *Steiner v. Hawaiian Trust Co., supra* n. 8.