A. J. WILSON v. CLINTON MOLINE.[1]

July 1, 1949.

No. 34,756.

[1]Reported in 38 N. W. (2d) 201.

*Leslie S. High,* for appellant.
*Robert B. Gillespie* and *Howard F. Johnson,* for respondent.

LORING, CHIEF JUSTICE.

This is an action for the accounting of profits derived from a partnership formed to raise turkeys during 1945 near Isanti, Minnesota. The trial was before the court, which concluded that plaintiff had been overpaid in the sum of $198.50. Plaintiff appeals from an order denying his motion for new trial.

May 8, 1945, the parties entered into a written partnership agreement for the raising of turkeys, under which plaintiff, A. J. Wilson, contributed $5,000 to apply on the purchase of baby turkeys and other expenses. Clinton Moline, defendant, agreed to furnish grounds, buildings, and equipment for the raising of approximately 12,000 turkeys. It was agreed that Wilson was to have a drawing account of $130 a month; that the partnership accounts were to be kept accessible to the parties; and that the partnership was to terminate at the end of the season of 1945, whereupon Wilson was to be reimbursed for the sum of $5,000 advanced by him and to receive all the profits from the sale of one-fourth of all turkeys raised and marketed by the partnership during the 1945 season "as shown on the account books of this partnership." It was further provided that upon receipt of the sum of $5,000 and profits by Wilson "this partnership shall be wholly terminated."

Some 10,711 turkeys were raised and marketed. At the close of the 1945 season, $5,000 was paid to Wilson, and, in addition to the monthly drawing account, the sum of $2,378.86 was paid on account of the profits of the partnership. In his complaint, plaintiff alleged that his interest and share in the profits from the partnership greatly exceeded the sum of $2,378.86. He further alleged that the books of the partnership were kept entirely by Moline, to which Wilson was not given complete access for examination, and that there was no accounting of the partnership between the parties.

It appears that Wilson was in charge of the operation of the farm insofar as the feeding, raising, and care of the turkeys was concerned. Moline was in entire charge of the account books and finances of the partnership. Moline also operated another turkey farm and a separate company under the style of Moline Feed Company, which sold turkey feed, commercial mash, corn, and oats. The partnership "books" were kept in the office of the feed business at Isanti, Minnesota, and not at the farm. The "records" of the partnership were kept in the same account book as Moline kept the records for a different turkey farm partnership, called the Berglof partnership, the feed business, and his personal affairs. This account book was a mere check register. It made no distinction between transactions for maintenance of buildings between the two turkey partnerships nor the amounts of feed allocated thereto. The chief supporting vouchers were unsigned weight slips and a few bills of lading for carload lots of feed. It appeared that when the season was ended in October 1945 the books of the partnership were not in a current condition.

Not until December 1945 did plaintiff receive $2,000, representing his share of the profits, with a note stating that the balance would be paid after defendant had the accounts straightened out. January 18, 1946, Moline sent to plaintiff a statement purporting to be an accounting of the partnership. No additional credit as his share of profits was given to Wilson. This statement listed the names of persons to whom checks were paid, the numbers of the checks, and, in columnar form, the type of item for which each check was drawn

(*e. g.,* labor, feed, poults, insurance, interest, electricity, and supplies). The footings for the respective columns are as follows:

| | | |
|---|---|---|
| Labor | $ 3,020.55 | |
| Feed | 39,752.74 | |
| Poults (no footing shown) | | ($10,251.50) |
| Ins. and Int. | 1,717.64 | |
| Electr. | 169.26 | |
| Supplies, etc. | 2,353.71 | |
| | | ($57,265.40) |

At the trial the chief conflict in testimony evolved from the amounts aggregating $39,752.74 allocated to feed. These amounts were supported simply by checks and the bills of lading for large quantities, of which $35,670.93 was made out to the Moline Feed Company and $1,352.80 to Cargill, Incorporated, with which only the feed company dealt. There were no running records or contemporaneous vouchers for the amount of grain or commercial mash used by the Moline-Wilson partnership, for the actual delivery of feed for use upon that turkey farm, or for the items for which checks were prepared as creditors' claims upon the partnership.

Defendant was selling the same commercial mash, corn, oats, and grain in a retail feed business to other customers than the partnerships. He would haul commercial mash from the Wilson partnership farm in very substantial amounts to other places in a large area around Isanti. He testified that he did this on a half dozen occasions. There was no record of these occasions, of how many sacks were taken, or of what was done with the accounting charged to the farm in connection with those sacks. It was also clear that at least 35 tons of mash were hauled from the Wilson partnership farm to the Berglof partnership, in which defendant was also interested. No record was kept of these amounts. There were other contested items in the account concerning miscellaneous expenses charged to the partnership.

Based on the testimony, exhibits, and purported accountings introduced at the trial, the court found that the following was a true and correct profit and loss statement:

"That as the result of a full and accurate accounting of the partnership accounts, the following is a true and correct profit and loss statement of the partnership operation:

| | | |
|---|---|---|
| "Received from sale of turkeys | | $66,836.22 |
| "Disbursements: | | |
| Poults | $10,251.50 | |
| Feed | 39,752.73 | |
| Labor | 3,463.67 | |
| Gasoline, supplies, etc. | 2,685.73 | |
| Insurance | 848.48 | |
| Taxes | 123.86 | |
| Telephone and electricity | 136.15 | |
| Interest | 852.66 | 58,114.78 |
| "Partners' profit | | $8,721.44 |

"That plaintiff's share of said profit amounts to $2,180.36. That defendant has advanced to plaintiff as his share of the profit of said business the sum of $2,378.86, creating an overpayment in the sum of $198.50."

The court ordered that the partnership be formally dissolved and ordered judgment for defendant against plaintiff in the sum of $198.50.

The following questions are raised by the assignments of error and motion for new trial:

(1) Was there error in the finding below that plaintiff and defendant performed the duties and obligations by each to be performed in accordance with the partnership agreement?

(2) Did the trial court err in receiving in evidence defendant's exhibit 1, the purported statement of operations of the partnership in question, where the person preparing the statement did not

testify that it had been made in the course of business and did not show the source of the entries contained therein?

(3) Did the court err in receiving defendant's exhibit 2, the purported statement of feed consumed, and exhibit 4 pertaining to miscellaneous expense, for the reason that no proper foundation had been laid for its admission and because it related only to the business of the Moline Feed Company and not to the partnership?

■ The strongest reasons why defendant should not be permitted to profit from any irregularities or inaccuracies in his accounting system are based on the fiduciary relations which Moline undertook by his partnership contract with Wilson. The situation is not that of a vendor of feed establishing his claim to recover for goods sold and delivered. Here, a fiduciary has mingled the trust *res* with his own property, and, indeed, with property of a business adverse to the partnership.

The uniform partnership act, M. S. A. 323.20, declares that a partner is accountable as a fiduciary.[2] If § 323.21[3] (right to an account) is read with § 323.20, the conclusion is obvious that the duty to provide the account in accurate form rested on defendant. This was the position taken in Lundquist v. Peterson, 134 Minn. 279, 158 N. W. 426, reversed on rehearing. *Id.* p. 288, 159 N. W. 569. In that case, plaintiff had contributed a certain amount to a farming operation conducted by him and by two cousins, who were in active charge of the farm. The court below found that in plaintiff's absence defendants had used partnership funds with which to buy lands in their own names and that they mingled their own and the partnership funds; hence it was impossible to determine the

---

[2]"Every partner must account to the partnership for any benefit, and *hold as trustee for it* any profits derived by him without the consent of the other partners from any transaction connected with the formation, *conduct,* or liquidation of the partnership or *from any use by him* of its property." (Italics supplied.)

[3]"Any partner shall have the right to a formal account as to partnership affairs—

\* \* \* \* \*

"(3) As provided by section 323.20; or

"(4) When other circumstances render it just and reasonable."

status of the partnership accounts. On appeal, this court affirmed insofar as it held that *defendants should account to plaintiff* for the amount of his contribution to the partnership, with legal interest, minus amounts he had received from the copartnership. The court adopted the rule applied to a trustee in like circumstances.

This rule is set out in Restatement, Trusts, § 172, which concerns the duty of the trustee to keep accounts and render them:

"The *trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust.*" (Italics supplied.)

*Comment b* reads:

"If the trustee fails to keep proper accounts, he is liable for any loss or expense resulting from his failure to keep proper accounts. *The burden of proof is upon the trustee to show that he is entitled to the credits he claims,* and his failure to keep proper accounts and vouchers may result in his failure to establish the credits he claims." (Italics supplied.)

*Comment b* of Restatement, Trusts, § 172, should be read with M.S.A. 323.20 (partner accountable as a fiduciary) and § 323.21 (right to an account).

Under the facts of the case at bar, defendant was deriving profits from the sale of feed to the turkey-raising partnership, at least to the extent that it was not being delivered to the Wilson-Moline farm and was being used in the feed company business or for the Berglof-Moline partnership. Plaintiff is entitled to an accurate account. Defendant cannot produce such an account. He has kept inadequate books. The burden of proof is on defendant, as trustee, to show that he is entitled to the credits he claims for the feed sold by his personal feed business to the partnership.[4] His failure to keep accounts and vouchers should work to his disadvantage and, ultimately, in failure to establish the credits he claims, and not to the disadvantage of the claimant, who did not keep the books and had no access to them.

---

[4]Cf. Sweatt v. Johnson, 97 Vt. 177, 122 A. 501.

■ The burden of producing evidence at trial should have shifted[5] to defendant, once it was shown that Moline's control over the account books was exclusive, that he did not maintain current or even approximately accurate records, and that he had an interest adverse to the partnership, shown by self-dealing. Our statutes impose a continuing duty to maintain partnership books in accordance with the agreement between the partners, together with the right to have access to or inspection of such accounts. There is also a duty to render to any partner on demand true and full information as to all things affecting the partnership. On one occasion in the instant case, plaintiff and his counsel were not given access to the partnership books, which was a breach of the duties imposed by M.S.A. 323.18[6] and 323.19.[7] Furthermore, the decisions, in other states under these provisions of the uniform act, establish the rule that

---

[5] The distinction between the burden of going forward with the evidence and the burden of persuasion has been recognized in our cases. See, Rustad v. G. N. Ry. Co. 122 Minn. 453, 456, 142 N. W. 727, 728. Commissioner Dibell said in that case, involving a suit for liability for goods destroyed in a railroad car, in which this court granted a new trial because under the evidence the question of defendant's negligence was for the jury: "Where the burden of proof should rest 'is merely a question of policy and fairness based on experience in the different situations.' 4 Wigmore, Evidence, § 2486. We hold that when the liability of the carrier has become that of a warehouseman and the loss of the goods shipped is established, the burden of proof is upon it to show its freedom from negligence. This burden is not merely the burden of going forward with the evidence, nor a shifting burden, but a burden of establishing before the jury absence of negligence." See, also, 9 Wigmore, Evidence (3 ed.) § 2488; First Nat. Bank v. Ford, 30 Wyo. 110, 216 P. 691, 31 A. L. R. 1441; Maguire, Evidence, Common Sense and Common Law, 175–180; Am. Law Inst., Model Code of Evidence, Rules 1(2)(3), 11, *comment,* pp. 89–90; Thayer, Law of Evidence, 376.

[6] "The partnership books shall be kept subject to any agreement between the partners, at the principal place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them."

[7] "Partners shall render, on demand, true and full information of all things affecting the partnerships to any partner or the legal representative of any deceased partner or partner under legal disability."

the right to an accurate accounting and inspection continues unabated *after* dissolution of the partnership. U. L. A. Partnership (1949) §§ 18, 19. The burden of proof in such cases, in the sense of the burden of producing evidence, is placed upon the partner who has kept the records, once a breach of good faith is shown. Woodacre v. Woodacre, 314 Mass. 70, 49 N. E. (2d) 247; Seeley v. Dunlop, 157 Md. 378, 146 A. 271. But cf. Bracht v. Connell, 313 Pa. 397, 170 A. 297, where errors in a contractor's accounts were not sufficiently proved. See, Restatement, Trusts, § 172, *comment b, supra.*[8]

Woodacre v. Woodacre, *supra,* involved a bill in equity for an accounting between two brothers who were partners in the plumbing business. The books of account were kept by defendant at his home, where he did the bookkeeping at night. Defendant also prepared most of the estimates for contracts. Plaintiff did the manual labor in connection with the business. The partnership was dissolved. Thereafter, each of the partners began to do business separately. The Massachusetts court said (314 Mass. 73, 49 N. E. [2d] 248):

[8]The rule was similar at common law prior to the adoption of the uniform partnership act. The burden of proving the accuracy of the accounts falls on the partner who negligently or intentionally fails to discharge his duty. Sweatt v. Johnson, 97 Vt. 177, 122 A. 501. Cf. Lewelling v. Lewelling, 110 Va. 761, 67 S. E. 362; Leary v. Kelley, 277 Pa. 217, 120 A. 817; Navarro v. Lamana (Tex. Civ. App.) 179 S. W. 922. See, Ryman v. Ryman, 100 Va. 20, 40 S. E. 96; Bevans v. Sullivan, 4 Gill (Md.) 383; 22 Am. & Eng. Enc. of Law, 127.

Where the accounts maintained principally by one partner are inaccurate or confused, any doubts will be resolved against that partner. Hutchins v. Page, 204 Mass. 284, 90 N. E. 565, 134 A. S. R. 656; Costa v. Costa, 222 Mass. 280, 110 N. E. 309; Farley v. Epling, 217 Ky. 106, 288 S. W. 1041; Sweatt v. Johnson, 97 Vt. 177, 122 A. 501, *supra;* McGinnis v. McGinnis, 274 Mo. 285, 202 S. W. 1087. Cf. Wiggins v. Brand, 202 Mass. 141, 88 N. E. 840. See, Carrey v. Haun, 111 Or. 586, 596, 227 P. 315, 318; Charles v. Charles, 199 Ky. 208, 213, 250 S. W. 855, 857.

Where there is totally inconclusive evidence upon which the court can predicate no accounting, a court of equity will leave the affairs of the partners as they found them and undertake no rearrangement, especially where one of the partners has died, Lewelling v. Lewelling, *supra.*

"* * * The defendant conducted the business of the firm and made entries in the books of account in utter disregard of the rights of the plaintiff. Through fraud or negligence he failed to exercise that degree of good faith owed by one partner to another. The master reported that it was impossible for him to reconstruct the books of account of the partnership in view of alterations, changes and erasures made by the defendant."

As to the most controversial items, representing amounts collected by defendant from third persons indebted to the firm, the court sustained the master's finding (314 Mass. 74, 49 N. E. [2d] 249):

"* * * The master further found that upon all the evidence with respect to this issue he was not satisfied that the *defendant* was entitled to credit for any of these bills which he contended he paid and did not enter on the cash book; *and that he had not sustained the burden resting upon him of proving that he personally should be entitled to a credit for any sums paid out of partnership funds but not entered in the cash book."* (Italics supplied.)

Seeley v. Dunlop, 157 Md. 378, 146 A. 271, also involved an accounting in equity on a partnership which had been dissolved. The issue was procedural as to whether the partnership was formed to deal in securities. The demand was for $15,000 damages and full performance of the agreement. There was a demurrer to the complaint, which was overruled, and the cause was submitted for decree upon complaint and answer. It was held that the complaint was both a bill for discovery and for an accounting, and not merely for discovery. The court also held that the delinquent partner must account to his partner for his share of the profits and said (157 Md. 383, 146 A. 273):

"Equity will always intervene to prevent one partner from keeping or concealing the partnership books so that they cannot be inspected by his copartner; and this is true in a suit for the purpose of having an account taken after a partnership has been dissolved. One partner, no more than another, may be excluded from the

174

examination of the books of the firm. It is, furthermore, a gross form of misconduct for one partner secretly and fraudulently to appropriate common net profits to his sole benefit; and equity is peculiarly adapted for the correction of such breaches of the articles of partnership whenever they are discovered. Burns v. Heise, 101 Md. 163, 166, 60 A. 604; Code, art. 73A, secs. 18(a), (e), 19, 20, 21(1), 22, 30, 37, 43."

If equity would impose a bill of discovery where the accounting partner refused to produce books, Seeley v. Dunlop, *supra*, then equity should shift the burden of proof onto defendant in the instant case if he is going to claim credit and profit from his negligent bookkeeping. This is especially so under the rule of the decision in the Woodacre case, 314 Mass. 70, 49 N. E. (2d) 247, *supra*, once Moline's haphazard and misleading accounting practices are established. Any other result would be absurd and fly in the face of the statute requiring partners to render information. M. S. A. 323.19.

■ Defendant's exhibits 1, 2, and 4 should not have been received in evidence. These exhibits were prepared by a Mr. Moody, who did not testify at the trial. It was admitted that his recapitulation of the status of the partnership was based upon papers and figures furnished by Moline. Exhibit 1 was received in evidence as a true and correct account of the business of the partnership involved in this case. Counsel for plaintiff objected to the introduction of the exhibit for the same reason that he objected to the introduction of the individual items, exhibits 2 and 4, making up the pages of the accounting, namely, for lack of proper foundation.

Under the uniform business records as evidence act, adopted in this state in 1939 (M. S. A. 600.02)—

"A record of an act, condition, or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, *and if it was made in the regular course of business, at or near the time of the act, condition, or event,* and if, in the opinion of the court,

the sources of information, method, and time of preparation were such as to justify its admission." (Italics supplied.)

Under the Minnesota shopbook rule and at common law, entries contained in a ledger book have been held not admissible in evidence and hearsay where the entries were not made by a person who had personal knowledge of the transaction to which they related and where the record so made was wholly based on information received from a third party who kept the daily supporting memorandums. Carlton v. Carey, 83 Minn. 232, 86 N. W. 85.[9] Such loose-leaf ledger sheets, such as contained in exhibit 1, would be admissible in the court's discretion if they had been identified by the party under whose supervision they were compiled *and if the entries had been made in the regular course of business.* Cf. H. F. Shepherdson Co. v. Central F. Ins. Co. 220 Minn. 401, 19 N. W. (2d) 772.

Nor can defendant derive support from the account-book statute, § 600.05, which is not a part of our uniform business records act.[10] That section has been strictly construed insofar as the requirements of preliminary proof are concerned. Thus, the court has established

---

[9] Cf. Stickney v. Bronson, 5 Minn. 172 (215) (memorandum not made by one having personal knowledge of facts stated therein; improperly received); Price v. Standard L. & A. Ins. Co. 90 Minn. 264, 95 N. W. 1118 (entries made by third person from doctor's statements were hearsay; reversed). See, 2 Dunnell, Dig. & Supp. § 3346.

[10] "* * * The entry of charges or credits, involving money, goods, chattels, or services furnished or received, when the furnishing or receipt thereof constitutes a part of the usual course of business of the person on whose behalf such entry is made, shall be received as evidence tending to prove the fact of the furnishing or receiving of such moneys, goods, chattels, or services, *whether the same be contained in an account book, or in a so-called loose-leaf, card, or similar system of keeping accounts,* and whether the same be made by handwriting, typewriting, or other similar means, *if it shall appear that such entry was made by a duly authorized person contemporaneously with the transaction therein referred to, as a part of the general system of accounts of the person on whose behalf the entry is made, and that the same is made in the usual and ordinary course of such business.*" (Italics supplied.)

a distinction between entries or memoranda made by third parties, strangers to the action, in the regular course of business, which are admissible, and similar entries made by such third parties which are normally not a habit or a normal function of that third person. The latter are excluded because the circumstances are not calculated to insure accuracy or to preclude any motive of misrepresentation. Tiedt v. Larson, 174 Minn. 558, 219 N. W. 905. See, 2 Dunnell, Dig. & Supp. § 3346. It is important that a preliminary identification of these records be made to the effect that the entries were made in the ordinary course of business and as soon as practicable after the transaction. Cf. Woolsey v. Bohn, 41 Minn. 235, 42 N. W. 1022. See, 2 Dunnell, Dig. § 3345, note 18. The instant case is also distinguishable from Webb v. Michener, 32 Minn. 48, 19 N. W. 82, where the account books of a partnership offered in evidence contained entries which were asserted to be the original entries made in the usual course of business as the transactions occurred. In that case, it was held unnecessary to produce an absent partner to identify certain entries, although one partner testified that he could not identify particular transactions from memory.

Our cases have often stated that the competency of books of account as evidence is primarily a question within the discretion of the trial court. See, Farmington State Bank v. Delaney, 167 Minn. 394, 209 N. W. 311, 46 A. L. R. 1495. The foundation necessary for the introduction of such documentary proof is also a question within the trial court's discretion. Topinka v. Minnesota Mut. L. Ins. Co. 189 Minn. 75, 248 N. W. 660, 95 A. L. R. 739. See, also, Garbisch v. American Ry. Exp. Co. 177 Minn. 494, 225 N. W. 432. But should such a rule apply where a breach of fiduciary relation arises? In the present case, for the reasons stated, the court has exceeded its discretion, because the controversy involved a fiduciary relation and self-dealing by the accountable partner.

■ Plaintiff argues that, once defendant's exhibits 1, 2, and 4 were shown to have been erroneously received in evidence, there remained no credible testimony or evidence from which the trial court could sustain the charges made by defendant against the

partnership for feed and miscellaneous expenses. Plaintiff argues that, assuming the findings were based upon certain inaccurate records, defendant has not sustained the burden of proving that the findings of the court were manifestly and palpably against the evidence. He points out that this court has given the same weight to the findings of a court without a jury as to the verdict of the jury. 1 Dunnell, Dig. & Supp. § 411.

Was there sufficient documentary or oral testimony to sustain the court's findings in view of the nature of the business and the informal fashion in which it was conducted? We think not. Defendant's penciled statement or accounting, mailed to plaintiff in January 1946, was received in evidence without objection to its being introduced as plaintiff's exhibit. It was precisely this accounting which was contested. It could not be the basis of a finding unless supported by suitable vouchers. Defendant's original position was that the checks and weight slips represented amounts of delivered feed consumed by the turkeys. But after discrepancies were shown between exhibit C (a penciled account) and exhibit E (a check register record of the Wilson partnership, the other partnership, the feed business, and Moline's personal affairs), defendant changed his position. Thus:

"* * * From anything I have got in those records when feed was used or when it was not used, I don't know how you can tell. When this corn that I purchased from Delmer Ross, Kate Oman, and C. Oman and A. Norling was used, I really don't know. I think we shelled that in August or September. I honestly don't know. I have no record of when we shelled that. We shelled this corn from Delmer Ross September 6. Here is a credit from there, what we got and what we sold to the mill. That's right. I sold this corn to the mill because it wasn't fit for the turkeys. I did not charge it all to the turkeys; it is taken out right here. Here is the credit slip. * * * I did not use all the corn that was purchased from Kate Oman and C. Oman and A. Norling in this operation. We sold

some to the Isanti Feed Mill Company. Credit was given us there. * * *

"Of the checks that we have offered in evidence, no specific one related to the payments made to the Isanti Cooperative Produce Company. This was carried on a running account. Sometime I made a statement of which was to be charged to the Harland Berglof operation and which was going to be charged to this operation from that Isanti Cooperative Produce Company. I made that separation, * * *."

Shortly thereafter Moline again changed his position:

"I am charging this Oman corn, this Norling corn, up to this operation. I am charging a total of over 36 pounds per bird. I am saying that the birds were consuming over 117 pounds per bird. I know that it requires less feed per bird where they have green pasture than where they do not."

Thereafter, the first witness for defendant was an "expert," who worked for Cargill, Incorporated, setting up turkey-raising programs. He testified as to the average costs and type of feed needed in the area between Duluth and Iowa. He said that 117.22 pounds of feed per bird was not abnormal, but was about the average consumption. Standing alone, this testimony was too remote to sustain the feed charges made by defendant against the partnership, much less to sustain the challenged miscellaneous expenses which were not sustained by the vouchers.

Reversed and new trial granted consistent with the rules set forth in this opinion.