GOBINDRAM J. WATUMULL, FOR HIMSELF AND AS TRUSTEE FOR WATUMULL BROTHERS, A SPECIAL PARTNERSHIP COMPOSED OF GOBINDRAM J. WATUMULL, JHAMANDAS WATUMULL AND RAMCHAND WATUMULL, AS GENERAL PARTNERS, AND MILTON CADES AND ERNEST R. CAMERON, TRUSTEES UNDER DEED OF TRUST OF GOBINDRAM JHAMANDAS WATUMULL, DATED JULY 1, 1942, AS SPECIAL PARTNER, *v.* OSCAR ETTINGER, CARRIE ETTINGER AND RICHARD ETTINGER, INDIVIDUALLY AND AS COPARTNERS DOING BUSINESS AS ETTINGERS WHOLESALE JEWELERS.

No. 2699.

Argued October 31, November 1 and 2, 1951.    Decided January 3, 1952.

Towse, C. J., Le Baron and Stainback, JJ.

OPINION OF THE COURT BY STAINBACK, J.

A bill of complaint was filed August 4, 1944, by the petitioner herein, a special partner in a partnership consisting of petitioner and Oscar Ettinger called the Hawaii Dis-

tributing Company, against Oscar Ettinger, managing partner, and Carrie Ettinger, his wife, charging fraud, breach of fiduciary obligations in the liquidation of the partnership, and praying for an accounting, appointment of a receiver, declaration of trust, discovery, and other relief.

The application for the inspection of the books and records of a new business set up after notice of dissolution of the partnership, ostensibly in the name of Carrie Ettinger, was resisted on the ground that Oscar Ettinger "did not have and has not at any time had" any interest in the business conducted by his wife, Carrie Ettinger. However, the application was granted, though apparently many letters and records relating to this business never were made available.

The Ettingers filed separate answers on October 16, 1944, but failed to answer the interrogatories filed with the complaint until compelled to do so by a special order entered on October 24, 1944.

Meantime, a receiver *pendente lite* was appointed on August 12, 1944, to take control of all the then undisposed of assets belonging to the partnership, *i.e.*, the Hawaii Distributing Company, and theretofore under the control and custody of Oscar Ettinger, who was the managing and liquidating partner.

Thereafter, on October 25, 1944, the respondents having failed to file a substantial number of records, the petitioner filed a contempt proceeding to retrieve certain identified cables, letters, statements, correspondence and records of the partnership, and also deeming the answers evasive and unresponsive, on November 27 filed a motion that the Ettingers be ordered to submit to an oral examination. The motion was granted on February 21, 1945. Extended hearings were held on the contempt proceedings, during which certain of the records and documents theretofore

withheld were made available to the receiver. After an extended proceeding and various oral orders relating to documents and partnership papers, the court directed the receiver, as master, to check the apparently missing papers and report to the court. This report was filed November 27, 1944. Many of the missing papers and much of the correspondence was never produced. Other papers which apparently were missing from the files of the partnership were eventually made available in copy form through subpoenas issued to cable companies, banks, post office and others.

Trial on the merits commenced on March 5, 1945, and the taking of testimony was completed May 29, 1945. During the trial Richard Ettinger, the son of Oscar, had been admitted into the firm of Ettinger's Wholesale Jewelers and a necessary party was joined as respondent by supplemental bill filed April 19, 1945. More than two years after the taking of testimony, on September 10, 1947, the chancellor filed his decision finding in substance that there was no equity in the bill and directing the receiver to present a statement of account covering the properties in his hands. The receiver's report, accounting for $30,277.40, constituting his receipts from the physical property turned over to him, was filed October 3, 1947. A final decree dismissing the bill, except for the receiver's account, was filed January 21, 1948. Appeal therefrom to this court was perfected January 24, 1948.

Petitioner, who had been engaged for many years in the merchandise business in Honolulu, conducted as a small department thereof a business known as the "Hawaii Distributing Company." In 1941 this business was that of manufacturers' agents and wholesale distributors and carried novelties and perfumes. On March 11, 1941, Oscar Ettinger, who had been an employee in a jewelry firm, was employed by petitioner as manager of this department of

his business. It appearing it would be profitable to go into the wholesale jewelry business, Ettinger departed for the mainland to secure mainland connections and accounts, this trip being for the account of and at the expense of the petitioner. Ettinger remained on the mainland from March 20, 1941, to May 15, 1941, and while there met Carrie Fisher who was herself experienced in the jewelry trade and who apparently aided Oscar Ettinger in making contacts for the supply of merchandise. Carrie Fisher returned to Honolulu and became an employee of the petitioner in the conduct of the Hawaii Distributing Company and in July, 1941, she married Oscar Ettinger. This branch operation was successful and profitable, making a substantial profit even in the six months of its existence and before the formation of the partnership.

On September 1, 1941, a special partnership consisting of Watumull and Oscar Ettinger, under the name of the Hawaii Distributing Company, the subject of this litigation, was formed. The partnership took over as a going concern the petitioner's wholesale jewelry business with the petitioner becoming a special partner, contributing "goodwill, trade name and trade connections of large but undetermined value," also agreeing to contribute cash in the amount of $10,000. Oscar Ettinger became a general partner, contributing his services plus several hundred dollars standing to his credit in the business of the Hawaii Distributing Company. The partnership agreement provided that the profits should be divided equally between the partners. Oscar, as general partner, was entrusted alone with the operation of the business and had sole authority to incur obligations and liabilities. Among other provisions the partnership agreement provided that either party had the right to terminate the partnership by giving forty-five days' notice; there was a further provision that at the termination of the partnership "in the event that

either party shall agree to continue the business and purchase the interest of the other partner, the amount to be paid shall be either the amount agreed upon by the partners or if they shall be unable to agree upon an amount, then the amount as shall be determined to be the fair and reasonable value of the assets and property purchased (including the fair and reasonable value of the goodwill of the partnership) by arbitrators appointed in the manner provided in paragraph 15 of these articles of partnership." Carrie Ettinger continued in the employ of the company after formation of the partnership.

With Honolulu the jumping-off place for the war in the Pacific and Pearl Harbor the home station and repair base for the Pacific Fleet, the streets were crowded with war workers and members of the armed forces. Thousands of soldiers were trained here before going to the front and literally hundreds of thousands passed through here going to and from the battle front, with large portions of the fleet frequently coming into Pearl Harbor. There were more people on the streets of Honolulu than ever before and most of them had money in pocket which they were eager to spend, particularly for souvenirs and tokens of remembrance to the folk back home. Naturally jewelry, being lasting and easily packed and shipped, was one of the most sought-after objects for presents and souvenirs to send or take back home. There was no problem of sale; the only problem was to obtain adequate merchandise. Consequently, the business of the Hawaii Distributing Company was highly profitable. During the calendar year of 1942 the partnership earned in excess of $175,000 and during the calendar year 1943 it earned in excess of $130,000.

During the fall of 1943 Oscar Ettinger sought to have Carrie Ettinger, who was still an employee, admitted into the partnership. The petitioner refused, apparently on the ground that he had some doubts of the legality of a partner-

ship in the Territory between husband and wife. Upon this refusal, and petitioner expressing dissatisfaction with the employment of the wife by the husband, Oscar Ettinger through his attorney gave notice of the dissolution of the partnership, under the provisions of paragraph 11 of the partnership agreement. In the letter addressed to petitioner at his home in Los Angeles, California, the suggestion was made that Oscar Ettinger would consider an offer either to purchase the partner's interest or sell his own and gave assurance "that Mr. Ettinger will continue to conduct the business as efficiently as he can until such day as the partnership is finally terminated." On December 1, 1943, Oscar wrote a personal letter to the petitioner, again affirming his interest in either buying or selling and giving notice that the business would be run efficiently "until the notice time expires, and I hope by that time everything will be settled entirely to both our satisfaction." He also stated that he would keep a safe balance on hand "to meet the obligations which occur regularly" and on the subject of merchandise stated that outside of diamond merchandise conditions did not look favorable as the factories were only giving the merchandise "on an allotment consisting of a percentage of what we received in 1942." Notice of the termination was received by the petitioner on the 5th day of December, 1943, so that the general partner, unless prior arrangements were made, would enter on his duties of liquidating the business on January 20, 1944.

Under date of December 16, 1943, the petitioner advised Oscar that it was his present feeling that the business should be liquidated but "before agreeing to *any proposition* it is my desire that the books of the Hawaii Distributing Company should be thoroughly audited." Thereafter, on December 28, Oscar made an offer to buy or sell the assets of the business on the basis of one hundred cents on the dollar on liquidated assets, including accounts re-

ceivable, and eighty cents on the dollar for inventory. There was some further discussion on the offer to buy or sell which, however, was after the notice of dissolution had expired on January 20, 1944, the final meeting to determine whether to buy or sell being on February 23, 1944.

During the negotiations on the buy or sell (all of which, except Oscar's original letter, apparently occurred after the date of dissolution) Oscar at no time made any offer or placed any value upon the good will of the business. This phase will be discussed hereinafter.

No agreement being entered into whereby either party was to continue the business and purchase the interest of the other ("including the fair and reasonable value of the goodwill of the partnership" according to provisions of the articles of partnership), the general partner became charged with the liquidation of the partnership business.

The question before this court is whether the respondent O. E. Ettinger, managing partner, properly discharged his duties as the liquidating partner. The petitioner claims that respondent failed to do this but, on the contrary, in fraud of the petitioner's rights, by a series of transactions most of which were kept secret from his partner, Oscar Ettinger converted and set over to himself and his wife substantially all of the benefit and profit and advantage of a valuable going business and that while charged with the duty of liquidating the partnership he engaged in competition with the partnership; that he arranged with his wife to enter the business and to take over all incoming merchandise including merchandise already delivered to the firm and merchandise on the way; that he secured the transfer to his wife of trade rights, trade connections, quotas and other trade relationships of large value to the partnership, and that the business conducted by the respondents should be held in trust for the partnership.

The respondent Oscar denied any plan to defraud peti-

tioner and specifically denied that he had made any arrangements for the transfer and setting over of the partnership business to his wife, Carrie Ettinger; he denied that there was any market in the Territory of Hawaii for the sale of the partnership business as a going concern; denied that the partnership possessed any "trade name, trade rights, trade connections, quotas or other contractual or other relationships which were of any value whatsoever"; denied that he conducted any activity to induce manufacturers, jobbers and wholesalers to divert their business from that of the partnership to that of Carrie Ettinger; denied that he has any part in the business now or at any time conducted by his wife, Carrie Ettinger; alleges that upon her discharge from the employ of the partnership she was legally entitled to engage in the jewelry business; alleges that the success of the business was the result of the efforts of Oscar and that it was mainly through Carrie Ettinger that business connections were assured; alleges that the petitioner refused to either buy the interest of Oscar or sell his interest in the partnership on the basis of an offer made by Oscar, and that the petitioner refused to arbitrate, in violation of the partnership agreement.

On these issues of fact created by the pleadings, requested findings were filed by both parties with the court below. However, the chancellor made no specific findings on the questions submitted but held in substance as follows:

1. That the Hawaii Distributing Company at the outset was a small business handling jewelry in a small way;

2. That Oscar and his wife made a very strong team in the operation of the business;

3. That it was a matter of common knowledge in Honolulu that service men would congregate both inside and outside of jewelry stores and little else was required for

the successful operation of the jewelry business other than the ability to obtain a fairly steady stream of incoming supplies;

4. That in the ability to obtain such supplies the Ettingers were strong because of personal friendship with those having sources of supply;

5. That with both Ettingers known to be out of the partnership, the good will of the Hawaii Distributing Company had no value;

6. That in this country of free enterprise it was right and proper for the Ettingers to attempt to salvage everything that they could out of a profitable business;

7. That the law of partnerships is that one partner may legally require and expect the utmost good faith, *uberimma fides*, from another partner, but that this had no application to Carrie Ettinger because she was not a partner;

8. That the evidence of the Ettingers at times appeared "so lacking in complete frankness — even occasionally causing them to be evasive and almost furtive" that the chancellor was inclined to rule against them; however, because of the long lapse of time (about two and a half years) since the hearing he had a better understanding and so ruled in their favor.

First we must consider the weight to be given to the decision of the judge below. The attorneys for the appellees state in their brief "By a long line of decisions it is the settled rule in this court that the findings of fact of a trial court will not be disturbed on appeal if they are supported by substantial evidence." This is not the rule on the findings of a chancellor or a judge of the circuit court sitting at chambers in equity; nor do the cases cited by counsel for appellees support their contention.

*Sumner* v. *Jones*, 22 Haw. 391, 394, states that "on an appeal in an equity case the findings of fact made by a cir-

cuit court are not binding on this court, but there is a presumption that the case was correctly decided, and where the findings rest upon the credibility of witnesses and the weight of oral testimony, and inferences to be drawn from such testimony, and involve the consideration of opinion evidence, the findings of the judge who saw and heard the witnesses are entitled to much weight."

Likewise, in *Jellings* v. *Garcia,* 29 Haw. 698, 701, the court said that "when in an equity suit an issue of fact is decided upon conflicting testimony great weight will be given by this court to the finding of the trial court because the latter saw and heard the witnesses and was in a better position to pass upon their credibility and to weigh the evidence than this court is."

In *Hospital* v. *Wodehouse,* 33 Haw. 846, 857, the court points out that while an appeal from a decree in equity brings the entire record up for scrutiny and review, the court says: "* * * it is ever mindful that the findings of fact in the trial court, where witnesses are under examination and observation and where actions sometime speak clearer than recorded words, are entitled to great weight."

There are many other decisions pointing out that where the evidence is conflicting and the findings depend upon the credibility of the witnesses and the weight of the oral testimony, the findings of the chancellor who heard and saw the witnesses testify in open court are entitled to great weight.

Inasmuch as the chancellor himself stated that the evidence of the respondents at times appeared "so lacking in complete frankness," and that respondents appeared to be "evasive and almost furtive" (an understatement of the testimony of the respondents) and except for respondents' own "evasive" testimony, practically all of the evidence was documentary and it cannot be said that the findings depend upon the credibility of witnesses or the weight of

oral testimony, this court is free to analyze the evidence in this case and to disagree with certain of the chancellor's conclusions where he did make findings, and also point out that he made no findings whatever upon points essential to a proper decision of this case.

Although counsel for both parties have filed elaborate and painstaking briefs citing numerous authorities and have argued the case at length and with earnestness and ability, which briefs and arguments have been of great assistance to the court in a case involving such a lengthy record, we deem it unnecessary to review at length the numerous decisions cited, as there appears no great dispute upon what the law is, but whether particular facts come within certain well-settled principles of equity.

We believe there is no dispute of the principles of equity that the managing or liquidating partner occupies a position of trustee as regards the other partner, and we believe that there can be no question of the other equitable principle that a trustee cannot do indirectly what he could not do directly.

As stated in *Claughton* v. *Johnson,* 47 Wyo. 447, 38 P. (2d) 612, 615, " 'the authorities unanimously agree that there is scarcely any relation in life which calls for more absolute good faith than the relationship of partners.' " and, again: "It is held that the duties and disabilities imposed on one by the confidential relation which he holds to another extends to his 'agents or subagents, clerks, assistants and employees, to his attorney and to his partner in business.' 65 C. J. 487. * * * It is said in Iroquois Iron Co. v. Kruse (C. C. A.) 241 F. 433, 442, that, if a man may use his confidential relationships 'for the benefit of a relative, an employer, an employee, or a partner, it is idle to prohibit him from using them for his own individual advantage.' "

The court in the above decision then points out the

obligation is greater where the benefit is taken by the managing partner, and in our own case of *Dress Mfg. Co.* v. *Cadinha,* 36 Haw. 732, at page 743 it is stated: "A devious purchase or circuitous acquisition as here accomplished by the assignee in conjunction with the other respondents is therefore not only obnoxious to every objection against a direct purchase or open attainment, *but odious with a force increased in vigor by the added difficulty of detection.*" (Emphasis added.)

The duty of the liquidating partner is to secure the best possible price and it would seem to be "unnecessary to cite authorities in support of the proposition that upon a bill to wind up the affairs of a partnership it is the right of either of the partners to have the property sold so as to obtain the benefit of the sale of the good will." *Griffith* v. *Kirley,* 189 Mass. 522, 76 N. E. 201, 44 A. L. R. 524, and cases cited in note thereunder; as in the present case the liquidating partner holds the position as a trustee, it is his duty to sell the assets to secure the benefit of the sale of the good will. The liquidating partner herein made no effort to so sell.

The contention is made, however, by respondents — and the chancellor agreed — that there was no good will or rather, that it had no value with the Ettingers "known to be out of the partnership." The chancellor based such finding *solely* on the fact that the item of supplies was the lifeblood of the business and that the ability to obtain supplies was "personal to the Ettingers" due to their friendship with the sources of supply.

As pointed out, the mainland connection with dealers was made before the formation of the partnership — to be true, by Ettinger — but on a trip to the mainland financed by Watumull; such connections inured to the benefit of Watumull and subsequently to the partnership firm to which they were assigned. Again, outside of the testimony

of respondents, there is nothing to indicate that all the dealers would immediately repudiate the quotas which they had agreed to furnish the Hawaii Distributing Company. In fact, the contrary appears from Carrie Ettinger's own testimony that the sources of supply would go to anyone who went after them, and from a number of shipments that were made after notice of dissolution and the fact that the quotas later obtained by the Ettingers were based on the business of the previous year. To what extent the partnership could have been sold as a going concern, and to what extent it could have carried with it the quotas promised by dealers and the shipping priorities and business connections and other items of good will, will never be known because Ettinger made no attempt whatever to sell as a going concern as requested by petitioner, but immediately by his own actions — and more particularly by the actions of his wife — and without the knowledge of the petitioner (who resided in Los Angeles), began to take over the business of the Hawaii Distributing Company and to set up a competing business ostensibly under the wife's name but actually financed and aided in every way by Oscar. Though Oscar Ettinger stated under oath in his answer that he had no interest in his wife's business, Carrie Ettinger states in a letter to one of the suppliers that "my husband and myself will enter into a co-partnership and carry on the wholesale jewelry business, which my husband started, and had half interest in." In the same letter she requests the firm to supply her "as much merchandise as you possibly can divert my way"; and further, "in the meantime please ship *against allotments,*" obviously the *allotments* to the Hawaii Distributing Company.

It cannot be questioned that during the period from November 30 to January 20, the date of the termination of the partnership, and during the subsequent months thereafter when the managing partner was supposed to be

liquidating the firm for the account of the partnership, both Oscar and Carrie Ettinger were giving their time and making every effort to take over the old business, striving with might and main to set up their own business rather than to obtain the best price for the partnership business. It is a fair inference that if Oscar had spent the several months subsequent to his notification of dissolution of the partnership in liquidating the business as a going concern, liquidation could have been completed more profitably and the business sold as a going concern; but, as he admitted, no attempt of any kind was ever made to liquidate as a going concern.

Without attempting to discuss all the letters, wires and other actions disclosing this purpose — even though a large part of the records were never produced — it appears that Carrie Ettinger before the dissolution of the partnership had already requested and was making every effort to and did obtain quotas previously promised to the partnership and that after termination but before liquidation she actually received goods shipped to the partnership, that she filled orders addressed to the partnership, in certain cases taking over goods of the partnership at cost and selling them at a profit; but most revealing of all is that when the managing partner, Oscar, whose duty it was to liquidate this business for the best possible price, departed for the coast immediately after the termination of the partnership and actually put Carrie Ettinger in charge of the liquidation of the business of the partnership; further, she used in her own business the employees of the partnership who were being paid by the partnership.

As further evidence of the intent to take over the partnership business lock, stock and barrel, Carrie used on her own invoice the statement "Formerly of Hawaii Distributing Co.", though she claimed that she never authorized this, that it was a mistake of the printer which she ex'd

out on the forms she used. This claim of a printer's mistake seems fantastic as printers ordinarily do not set up forms for invoices without instructions and also submit proof before final printing. In view of the obvious false testimony of respondents throughout the hearing and, further, that a letter dated February 10, 1944, addressed to a Mr. Dawson, Ship's Service, Naval Air Station, enclosing invoice which contained the heading *not ex'd out,* little stock can be taken in this explanation.

Respondents cited authorities that either partner after dissolution of the partnership has the right to solicit the business from customers of the firm. Such right, however, is quite different from the present case where a liquidating partner who had been requested to liquidate the business as a "going concern" pending the winding up of the affairs of the firm secretly took over the goods of the partnership and its quotas by soliciting and notifying suppliers of the goods that Hawaii Distributing Company was being liquidated and, in certain instances, requestng them to ship goods formerly ordered or promised the partnership directly to his wife, Carrie Ettinger. Thus, at least as early as December 27, Carrie Ettinger and Oscar Ettinger were setting up a competing business and later were filling orders addressed to the partnership either from their own stock of goods or taken from the partnership and making a profit thereon, were using the employees of the partnership in their own competing business prior to the liquidation of the firm, and giving the impression to suppliers that the new business was the successor of the partnership.

Oscar Ettinger testified that he broke up the business and began to sell its bare bones because his partner told him to "liquidate," though at all times petitioner insisted on the business being liquidated as a going concern. The testimony that the respondent doubted his authority to continue the business by making new purchases, etc., would

come with more grace if Oscar had not himself handled the liquidation so as to profit himself. The partnership agreement by its very terms contemplated that the good will, trade name and trade connections should be one item to be considered in fixing valuation upon dissolution, and without question necessary purchases could be made and the business continued until it could be disposed of as a going concern. *Implement Co.* v. *Keyser,* 99 Kan. 8, 161 Pac. 592, 593 : "It was the duty of the surviving partner, who assumed the task in this case, to wind up the business within a reasonable time and in the way most advantageous to those interested in the estate, * * * In some cases the bulk sale of merchandise may be the better method, while in others a sale of the goods in the usual course of trade may be to the advantage of the interested parties. In the latter case some articles may be purchased and added to the stock in order to make it more salable and to facilitate an advantageous disposition of the whole. When this is done in good faith the goods purchased as well as the reasonable expenses incurred in carrying on and winding up the business may be paid from the funds derived from the sale." (Citing cases.)

The facts in the case before us show that the general partner had available very large assets and funds (approximately $150,000) that could have been used for the preservation of the going business.

This is not merely a case of a liquidating partner using his best judgment in failing to order or to accept merchandise shipped to the copartnership, but one where the trustee places himself (and his wife with whom he is jointly acting) in a position of conflict by competing with his trust. In such case the standard of conduct of the trustee is more exacting. "As long as he [the trustee] is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care and skill and caution.

When, however, the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. In such a case his interest must yield to that of the beneficiary." 2 Scott, *Trusts* § 170.25, p. 909.

Again, it is very obvious that the acts of the wife *left in charge of liquidating the business by her husband* were the acts of Oscar (*"Qui facit per alium, facit per se."*) even had the two not collaborated from the very notice of the dissolution of the partnership in carrying out carefully laid plans.

It is elementary that it is the duty of a liquidating partner as bearing a fiduciary relation to the petitioner to keep accurate and complete items of account and to make frank disclosure. 3 Scott, *Trusts,* § 495, p. 2410; *Simich* v. *Culjak,* 27 Wash. (2d) 403, 178 P. (2d) 336, and the burden of proving the accuracy of such accounts is upon the liquidating partner.

In *Wilson* v. *Moline,* 229 Minn. 164, 38 N. W. (2d) 201, it is stated as follows:

"The uniform partnership act * * * declares that a partner is accountable as a fiduciary. * * * This rule is set out in Restatement, Trusts, Sec. 172, which concerns the duty of the trustee to keep accounts and render them. 'The trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust.' * * *

"Plainiff is entitled to an accurate account. Defendant cannot produce such an account. He has kept inadequate books. The burden of proof is on the defendant, as trustee, to show that he is entitled to the credits he claims for the feed sold by his personal feed business to the partnership. His failure to keep accounts and vouchers should work to his disadvantage and, ultimately, in failure to establish the

credits he claims, and not to the disadvantage of the claimant, who did not keep the books and had no access to them."

Neither the liquidating partner nor his wife, Carrie Ettinger, kept such books of account, but quite the contrary. Carrie Ettinger's books were admittedly incomplete and falsified as to some matters, particularly regarding the origin of the $17,000 deposit in the Bank of Hawaii in the joint names of the Ettingers accidently discovered, which will be referred to hereinafter. Further, Carrie Ettinger's book of invoices was mutilated, apparently to conceal actual transactions regarding the taking over of items of the partnership property and disposing of the same. Not only could the receiver not obtain a record of the items belonging to the partnership at the time of the dissolution, but there is no record of what merchandise should have been on hand in the partnership at the close of business as of December, 1943. The respondents themselves admitted the impossibility of ascertaining from the books how much the purchases from the partnership were. A most casual examination of the records discloses how hopelessly the affairs of the partnership were intermingled with those of the new business and how many benefits inured to the new business through taking over of the quotas, shipping priorities and merchandise on consignment and merchandise ordered by the partnership. Shipping priorities to the Hawaii Distributing Company dated January 11, 1944, were canceled by Carrie Ettinger and reissued in her name. The evidence concerning watch straps shipped by freight to the partnership was discovered by accident; the Ettingers did not bring forward the information nor account for the proceeds. In at least one case a supplier, when informed by Carrie Ettinger she was taking over the memorandum of merchandise shipped to the partnership and requesting him to make new memorandum to the C. Ettinger Company, promptly replied that he preferred to

allow arrangements to stand as had been made. Carrie Ettinger testified there was no registry in which was recorded all the merchandise taken over by her and upon which she made a profit. Obviously, under the rules of partnership the burden was upon the respondents to show that all the memoranda of merchandise had been accounted for. This elementary principle of law was ignored by the chancellor in his decision below. It was the duty of the liquidating partner to account for the consigned merchandise as well as that purchased for the benefit of the partnership, and it was obviously more advantageous to sell such merchandise as a part of the partnership assets, merchandise which had been testified was so difficult to obtain and so easy to sell. It is ridiculous to say that this was an accommodation, an accommodation from which the Ettingers obviously profited.

There was no accounting for the packages received by registered mail although ninety-eight percent of the goods of the partnership was received by registered mail. Carrie Ettinger testified she thought the packages might have contained repairs. She admitted that one of the individuals who received one of the parcels never worked for the partnership, but only for Carrie Ettinger herself. There is no record of what merchandise received by registered mail was taken into her business, nor any record as to whether it was commingled with Carrie Ettinger's property, except as to two parcels admittedly taken over by Carrie Ettinger. It appears that large amounts of property for the partnership were commingled with Carrie Ettinger's own property in the operation of the new business and no account was rendered thereof. Carrie Ettinger herself admitted that she made profits from dealing with partnership property. Further, it appears that the bookkeeper of the liquidating partnership was also the bookkeeper for the competing firm although he was not paid a salary by the new business but

merely received gifts, and the sale of the partnership property for the month of February was merely $2,522 while Carrie Ettinger sold $28,544 in the same month, and in March Carrie Ettinger sold $34,156.83 and the partnership $1,685.58, and proportionately for the next three months until the appointment of a receiver; yet the partnership was charged with all the expense of the employees. It will be noted too that at this time Oscar Ettinger had gone to the coast and Carrie Ettinger was in charge of both the partnership business and her own. Thus, we have a situation where a husband and wife engaged in the liquidation of a highly profitable partnership, were also engaged in their own business, and there is an admission by them that from available records it would be impossible to tell what items of the property belonged to the partnership and what belonged to the new business.

During the trial it was discovered that there were substantial deposits of money in the joint account of the Ettingers in the Bank of Hawaii, the sources of such deposits not being reflected either in the books of the Hawaii Distributing Company or in the books of the new competing business. Carrie Ettinger had testified that all sales from both the old and the new business were recorded properly in the respective records of the old and of the new business, and had specifically denied that any of the deposits aggregating $17,000 were from the sale of jewelry. Without attempting to set down the numerous and devious explanations of Carrie Ettinger, the documented proof shows that her explanations were manufactured out of whole cloth and that most of the checks and deposits were conclusively shown to be the proceeds of the sale of merchandise to regular customers of the old business, even though there were no invoices in the partnership or in the Ettinger records corresponding to the amounts of the checks. Obviously, accurate accounts were not kept by Carrie Ettinger,

in fact she admitted that the jewelry which had been sold by her had never been put through the books of account and that on such sales no tax return had been made and no tax paid.

To enumerate the many derelictions of duty, concealment and false testimony of the respondents would be piling Pelion on Ossa. Suffice it to say that the allegations of petitioner are fully supported by a clear preponderance of the evidence. The liquidating respondent was a fiduciary and required to exercise the highest good faith in his dealings with petitioner; such fiduciary dealings did not end with the notice of dissolution but continued throughout the liquidation of the business. During such liquidating period respondent Oscar Ettinger, in collaboration with his wife, became interested in a competing business, transferred to himself and to his wife tangible assets without the knowledge or approval of petitioner, also intangible assets without compensation; he made false representations and concealments that resulted in profit to himself; he had ample authority to keep the business intact for liquidation as a going concern but failed to make any effort whatsoever to do this; respondents so commingled partnership property, both tangible and intangible, with the business and property of the Ettingers that a constructive trust must be declared and the burden of accounting for the partnership assets and partnership profits rests with the respondents. (*Meinhard* v. *Salmon,* 249 N. Y. 458, 62 A. L. R. 1; *Sorenson* v. *Nielsen,* 240 N. Y. Supp. 250; *Masterson* v. *Allen,* 69 S. W. (2d) 539; *Ambler* v. *Whipple,* 20 Wall. 546.) In such accounting the respondents must account for the profits made in the so-called Ettinger business up to the filing of the bill and for the value of the business as of that date, less credit for capital contributions and services that may have been furnished by respondents.

It is inexcusable that the chancellor delayed his de-

cision not for days or weeks or months but almost two and one-half years. The chancellor in attempting to justify this long delay stated: "* * * just as in physically viewing an object, a better view is sometimes afforded by not being too close to the object viewed, so, in mentally viewing or reviewing a set of circumstances, it often helps to a better understanding to have some time elapse between views taken." This was a case that should have been decided from the bench or at least shortly thereafter, and it is apparent that instead of getting a better view because of the distance of the object the chancellor had forgotten most of the evidence relating to the issues before him; except on the question of the value of the good will he made no findings whatever and obviously overlooked some aspects of that phase. When we add to the delay below the long delay in this court, due to some extent to the fact that this court for a period did not have a quorum and thereafter and until very recently had a vacancy, it must be admitted that it is impossible at this time to do complete equity to all parties in this case; in truth, one of the respondents has died since the beginning of this litigation. This case has been pending in the courts more than seven years and unless settled soon bids fair to become the *"Jarndyce* v. *Jarndyce"* of Hawaii. It well illustrates that justice delayed is justice denied. Obviously, this court should adopt the federal procedure and require quarterly reports from the trial judges that will show all cases under advisement for thirty days or more and the specific reasons for the delay in deciding them.

The decree is reversed and the cause remanded for further proceedings in conformity with this opinion.

*J. R. Cades* (Smith, Wild, Beebe & Cades with him on the briefs) for appellants.

*J. G. Anthony* (Robertson, Castle & Anthony with him on the brief) for appellee.